## IN THE UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

THE AIR CONDITIONING, HEATING AND
REFRIGERATION INSTITUTE et al.,

      Plaintiffs,

v.                                     No. CIV-08-633 MV/RLP

CITY OF ALBUQUERQUE,

      Defendant.

## DEFENDANT'S RESPONSE IN OPPOSITION TO
## MOTION FOR PRELIMINARY INJUNCTION

On October 1, 2008, the City will begin implementing its progressive green building code (the "Albuquerque Energy Conservation Code" or the "Code"), which was designed to reduce carbon emissions caused by electricity use in commercial and residential buildings. The Code was drafted only after extensive discussions and negotiations with members from all impacted industries, and it provides the industries with several options for compliance with the carbon reduction standards. In that regard, the Code is similar to many other green building codes passed by cities across the nation. Plaintiffs nevertheless seek to preliminarily enjoin the City from implementing the Code because they allege that one of the options available under the Code that prescribes energy efficiency standards for individual products is preempted by a narrow set of federal laws concerning energy efficiency standards for heating, ventilating, and air conditioning ("HVAC").

As is clearly evident, Plaintiffs fail to appreciate that compliance with the prescriptive standards is just *one* of several available options for reducing carbon emissions. The prescriptive provisions do not trigger application of federal preemption statutes because *they are not*

*mandatory*.  Other meaningful alternate paths are available that incorporate progressive green building standards – including LEED certification – that have been adopted by cities across the country.  These alternate standards heretofore have never been challenged by any of the Plaintiffs, including the national industry associations.  Ironically, by providing the prescriptive option -- which was requested by several industry representatives during the Code's development -- the City's Code in many ways is *less restrictive* than similar codes adopted by other cities that simply require certification with LEED or comparable standards.

Plaintiffs otherwise have failed entirely to meet their burden of demonstrating that the extreme remedy of a preliminary injunction is warranted.  Because they have not requested permits or otherwise attempted to comply with the Code, Plaintiffs' claims are not ripe for review.  Plaintiffs similarly fail to present any hard evidence that they will be "irreparably harmed" by allowing the Code to go into effect, instead relying on speculative assertions concerning increased costs and decreased sales.  Many of the alleged increases in costs impact consumers, not Plaintiffs.  In any event, changes in regulation sometimes increase compliance costs.  Such increases are hardly irreparable – particularly where many of the members of the Plaintiff associations are already complying with comparable code provisions in other parts of the country and even are actively marketing products with energy efficiencies identical to the standards that they challenge here.  Similarly, the balancing of hardships and public interest weigh squarely in favor of allowing the Code provisions to go into effect during the pendency of this action – just as similar provisions are in effect today.  For these reasons, the motion should be denied.

# I.   THE CODE PROVIDES ALTERNATE PATHS FOR ENERGY EFFICIENCY.

John Bucholz is the City's Green Building Manager and primary author of the Code.[1]  As detailed in his attached affidavit (Exhibit 1) and described below, the Code is the product of extensive meetings between government and industry to identify and incorporate alternate paths for increasing the energy efficiency of buildings and reducing carbon emissions.  The Code was not intended to require – and does not require – compliance with HVAC prescriptive standards.

As background, the City in 2005 began focusing on increasing the efficiency of the building industry to reduce the impact of commercial and residential buildings on human health and the environment.  The focus was based, in part, on studies indicating that the building industry generates 39% of carbon dioxide ("$CO_2$") emissions and 48% of all greenhouse gas ("GHG") emissions in the United States.  The Mayor initially directed all City-funded projects to comply with the Leadership in Energy and Environmental Design ("LEED"), described below.  In addition, the Mayor directed the City's Planning Department to consider preparing green building codes to promote and encourage green development for privately-owned buildings.  (Bucholz Aff., ¶¶ 7-8).

In furtherance of this objective, the Mayor in 2007 formed the Green Ribbon Task Force ("GRTF").  The Mayor asked the GRTF to guide and assist the City in developing and implementing changes to the City's building regulations to foster significant reductions in $CO_2$ and GHG emissions.  The GRTF was composed of 23 builders, developers, architects, unions

---

[1] Mr. Bucholz is responsible for, among other things, drafting green building ordinances, implementing energy conservation policies, and assisting the Mayor in his efforts to achieve the 2030 Challenge ensuring new buildings are carbon neutral by the year 2030.  In his general work for the City, Mr. Bucholz has become very familiar with the City's building codes and has reviewed over 15,000 sets of plans for compliance therewith.  (Bucholz Aff., ¶¶ 3-4).

and various companies, organizations and individuals.[2]   The Mayor directed the GRTF to be

sensitive to economic impacts that might stem from the implementation of green building codes.

(Bucholz Aff., ¶ 9).

The goal of the GRTF was to develop an energy code that reduced $CO_2$ and GHG

emissions, while providing industry with the flexibility to use innovative designs and techniques

to achieve the effective use of energy.  The GRTF wanted to provide industry with a code

focused on the overall characteristics of a building -- not the characteristics of individual

products.  It is crucial to emphasize that, in considering alternatives for energy conservation, the

focus of the GRTF was not solely on the HVAC and water heating equipment.  The focus was

much broader, examining (and ultimately codifying) provisions related to construction standards,

roofing, lighting, doors, windows, and swimming pools, among other things.  The GRTF

recognized that there are many factors other than the efficiencies of HVAC and water heating

products that impact energy use.  (Bucholz Aff., ¶¶ 9-10).

The GRTF began by reviewing rating systems in the building industry that adopt what are

known as "performance-based" standards.  The LEED rating system devised by the United States

Green Building Council ("USGBC") is the most widely accepted set of performance-based

standards for green building certification in the United States.  In the context of new construction

and major renovations, LEED evaluates buildings in six areas:  Sustainable Sites, Water

Efficiency, Energy and Atmosphere, Materials and Resources, Indoor Environmental Quality,

and Innovation and Design Process.  The system is credit-based, allowing projects to earn points

---

[2]   Participants included Wilson & Company, Advent Solar, Home Depot, Dekker/ Perich/Sabatini, Jaynes
Corporation, the National Association of Industrial and Office Properties, Public Service Company of
New Mexico, Cauwels & Stuve Realty, the Associated General Contractors of New Mexico, and District
Three City Councilman and architect, Isaac Benton.  (Bucholz Aff., ¶ 9).

within five areas. LEED provides four progressive levels of certification: certified (26-32 points), silver (33-38 points), gold (39-51 points), and platinum (52-69 points). The USGBC has developed LEED Rating Systems for several other types of projects, including but not limited to, "LEED for Existing Buildings" and "LEED for Homes."[3] Given the wide acceptance of the LEED standard, and its performance-based structure, the GRTF decided to adopt the LEED certification at the silver level as a performance-based alternative.[4] (Bucholz Aff., ¶¶ 12-15).

In addition to LEED, the GRTF decided to develop a second performance-based option. Under this second option, industry could choose to make proposed commercial and residential designs 30% more energy efficient than a baseline building or home. The purpose was to provide the building industry with additional flexibility to achieve energy efficiency in a building. Under this second option, the industry similarly would not be required to install specific products. Instead, they would have the option to comply with a broader mandate that applied to the overall performance of a building. (Bucholz Aff., ¶ 16).

As the Green Building Manager, Mr. Bucholz's personal desire was to develop an energy code that was fundamentally performance-based, which the LEED certification and 30%

---

[3]   The LEED standards are integral to consideration of Plaintiffs' claims that the Code is preempted. The documents, however, are hundreds of pages. Accordingly, the City has not attached them to this filing but reserves the right to seek admission of these standards at hearing.

[4]   LEED's Energy and Atmosphere category -- which largely pertains to heating, ventilating, air conditioning, refrigeration, and electrical systems -- contains the highest number of possible points of all the rating systems. In the context of new construction and major renovation projects, an applicant for LEED certification can accumulate 17 points under the Energy & Atmosphere category. The applicant can accumulate these points in a variety of different ways. For example, if an applicant can demonstrate that the new building is 31.5% more efficient than the baseline rating per ASHRAE/IESNA Standard 90.1-2004, that applicant will receive 7 points. Alternatively, if an applicant complies with the prescriptive measures of the ASHRAE Advanced Energy Design Guide for Small Office Buildings 2004, that applicant will receive 4 points. Additional points can be achieved by, among other things, implementing various commissioning techniques, using on-site renewal energy, or minimizing the use of refrigerants. (Bucholz Aff., ¶ 14).

reduction options were.  He was aware that other cities around the nation had implemented such

performance-based codes, many of which simply required compliance with LEED standards.

However, the GRTF – which included several industry representatives – wanted the Code to

contain another path to compliance based on prescriptive standards for individual products.

Therefore, in accordance with the request, Mr. Bucholz developed a prescriptive option based on

standards developed by the GRTF.[5]  (Bucholz Aff., ¶ 18).

In the course of developing these standards, Mr. Bucholz met with the full-body of the

GRTF once a month for six months beginning in January 2007.  He incorporated only those

standards that the GRTF agreed upon, by consensus, into the original draft of the Code.  He

observed the willingness of the members of the GRTF, who represented widely divergent

interests, to compromise in order to achieve consensus.  As a City employee, Mr. Bucholz has

actively participated in five code adoption cycles and can affirm that the level of participation by

the private sector in the development of the Code was unprecedented.  At the end of the

collaborative process, Mr. Bucholz drafted Volumes I and II of the Code.  (Bucholz Aff., ¶ 21).

    1.    Volume I of The Albuquerque Energy Conservation Code

Volume I of the Code applies to commercial and multi-family residential buildings.

Volume I adopts and incorporates by reference the American Society of Heating, Refrigeration,

and Air Conditioning ("ASHRAE") Standard 90.1-2004, with a few important amendments.[6]

---

[5]   As Mr. Bucholz notes, performance-based codes are significantly different than traditional prescriptive
codes.  Prescriptive codes prescribe a combination of specific materials and methods of construction that
must be used to achieve code compliance.  The objective achieved by using those materials and methods
of construction is neither stated nor defined.  Performance-based codes, on the other hand, identify only
an objective that has to be met:  a 30% increase in energy efficiency, for example.  The means for
achieving that objective are left to the industry. (Bucholz Aff., ¶ 19).

[6]   ASHRAE is an international organization that develops consensus standards for both its members and
others concerned with the heating, ventilation, air conditioning, and illumination of the built environment.

(Bucholz Aff., ¶¶ 23-24).   (Copies of Volume I and the relevant portions of the incorporated ASHRAE standards are attached to Mr. Bucholz's affidavit as Exhibits A and B.)

Consistent with the foregoing, Volume I of the Code provides two performance-based paths to compliance – LEED certification and 30% efficiency improvement.  (*See* Volume I, §§ 2.4(b), 6.5, 7.5).  Volume I also includes the third, prescriptive option requested by GRTF.  (*See* Volume I, §§ 6.3, 7.3).  This prescriptive option is limited, however, only to defined small retail and office buildings.  The prescriptive option does, in some cases, provide for energy efficiency standards for HVAC products in excess of the federal standards.  However, as noted, this is not by any means mandatory but merely an optional path.

It is important to note that Volume I generally applies to new buildings, additions to existing buildings, and alterations of existing buildings (including substantial alterations).  Volume I does *not* apply to repairs, provided that there is no increase in the annual energy consumption of the equipment following the repair (which in practice should never occur).  (*See* Volume I, §§ 4.2.1.3 and 6.1.1.3(a)).  In addition, Volume I does *not* apply to (i) energy used for industrial, manufacturing, or commercial processes; (ii) unaltered portions of a building; (iii) buildings that use little or no fossil fuels; or (iv) historical buildings.  (*See* Volume I, §§ 2.4(a) and 2.4(c)-(e)).  (Bucholz Aff., ¶¶ 26-27).

With respect to replacements of HVAC equipment in existing buildings, there is another important qualification.  In single unit replacements, building owners may choose none of these options and replace the unit with a unit of the same energy efficiency *provided* that the owner replaces or modifies other components in the building to make up for energy efficiency loss

---

ASHRAE was founded over 100 years ago to serve as a source of technical standards and guidelines.  The ASHRAE standards are developed and published to define minimum values of acceptable performance.

resulting from the decision not to use units that meet the prescriptive standards.  Thus, in the replacement context, this provides yet another path for compliance.  (*See* Volume I, §§ 4.2.1.3 and 6.1.1.3(b) and Bucholz Aff., ¶ 28).

Below is a Table providing a general summary of the application of Volume I to the various circumstances involving HVAC and water heating installation and repair.  The multiple compliance paths and limitations together provide meaningful alternatives for compliance in all circumstances.

| | Exemptions | | Alternative Compliance Paths | | Other Exceptions/ Limitations |
|---|---|---|---|---|---|
| | LEED Silver Exemption | Other exemptions[7] | Performance Rating Method (30% Increase from Baseline) | Simplified Approach Option (Prescriptive) | |
| **New Construction (4.1.1.1)** | Yes (2.4(b)) | Yes (2.4(a) and (c)-(e)) | Yes.  (4.2.1.1; 6.2; 6.5; 7.2; 7.5) | Yes, for certain small building types (4.2.1.1; 6.2; 6.3; 7.2; 7.3) | |
| **Additions (4.1.1.2)** | Yes (2.4(b)) | Yes (2.4(a) and (c)-(e)) | Yes.  (4.2.1.1; 6.2; 6.5; 7.2; 7.5) | Yes, for certain small building types, (4.2.1.1; 6.2; 6.3; 7.2; 7.3) | When an addition cannot comply, trade-offs will be allowed of the components of the existing building (4.2.1.2) |
| **Substantial Alterations (50% or more is work area) (4.1.1.4)** | Yes (2.4(b)) | Yes (2.4(a) and (c)-(e)) | Yes.  (4.1.1.4; 4.2.1.1; 6.2; 6.5; 7.2; 7.5) | Yes, for certain small building types, (4.1.1.4; 4.2.1.2; 6.2; 6.3; 7.2; 7.3) | |
| **Alterations (4.1.1.3)** | Yes (2.4(b)) | Yes (2.4(a) and (c)-(e)) | Yes.  (4.1.1.3; 4.1.1.6; 4.2.1.3; 6.2; 6.5; 7.2; 7.5) | Yes, for certain small building types, (4.1.1.3; 4.1.1.6; 4.2.1.3; 6.2; 6.3; 7.2; 7.3) | |

---

[7] Non-fossil fuel buildings, historic buildings, and portions of building used for industrial or manufacturing purposes.

|  | Exemptions | | Alternative Compliance Paths | | |
|---|---|---|---|---|---|
| **Replacement (4.1.1.6)** | Yes (2.4(b)) | Yes (2.4(a) and (c)-(e)) | Yes. (4.1.1.3; 4.1.1.6; 4.2.1.3; 6.2; 6.5; 7.2; 7.5) | Yes, for certain small building types, (4.1.1.3; 4.1.1.6; 4.2.1.3; 6.2; 6.3; 7.2; 7.3) | Compliance will not be required where a replacement requires extensive revisions to other systems, and such replaced equipment is like-for-like (4.2.1.3; 6.1.1.3(b)) or where changes to other components are otherwise made that, together with the replacement product, do not exceed the annual energy consumption of the replaced product. (4.2.1.3(c)) |
| **Repair (Only Covered in Connection with Alterations) (4.1.1.3)** | Yes (2.4(b)) | Yes (2.4(a) and (c)-(e)) | Yes. (4.1.1.3; 4.2.1.3; 6.2; 6.5; 7.2; 7.5) | Yes, for certain small building types, (4.1.1.3; 4.2.1.3; 6.2; 6.3; 7.2; 7.3) | Compliance will not be required for equipment that is being modified or repaired, provided that there is no increase in the annual energy consumption of the equipment (4.2.1.3; 6.1.1.3(a)) |
| **Change in Occupancy (4.1.1.5)** | Yes (2.4(b)) | Yes (2.4(a) and (c)-(e)) | Yes. (4.1.1.5; 4.2.1.1; 6.2; 6.5; 7.2; 7.5) | Yes, for certain small building types (4.1.1.5; 4.2.1.2; 6.2; 6.3; 7.2; 7.3) | |
| **Change in Space Conditioning (4.1.1.7)** | Yes (2.4(b)) | Yes (2.4(a) and (c)-(e)) | Yes. (4.1.1.7; 4.2.1.1; 6.2; 6.5; 7.2; 7.5) | Yes, for certain small building types (4.1.1.7; 4.2.1.2; 6.2; 6.3; 7.2; 7.3) | |

2.    Volume II of The Albuquerque Energy Conservation Code

Volume II of the Code applies to one and two family detached dwellings and townhouses (i.e., residences).   Volume II adopts and incorporates by reference the 2006 International Energy

Conservation Code ("IECC").[8]  (Bucholz Aff., ¶ 31).  (*Correct* copies of Volume II and the

relevant portions of the incorporated IECC standards are attached to Mr. Bucholz's affidavit as

Exhibits C and D.)[9]

It is important to note that Volume II applies to new construction, additions, alterations,

and renovations.  Volume II does *not* apply to unaltered portions of an existing building, aside

from replacements.  (*See* Volume II, §§ 101.7.3).  Volume II also does *not* apply to the

replacement of furnaces and air conditioners before July 1, 2009.  (*See* Volume II, §§

101.7.3(5)).  Similarly, Volume II does *not* apply where replacement of an existing furnace

would require extensive revisions to other systems or elements of a building.  (*See* Volume II, §

403.2).  Finally, repairs are *not* covered by these provisions at all.  (Bucholz Aff., ¶¶ 34-35).

Volume II contains the same two performance-based options as Volume I – LEED

certification and 30% energy reduction option.  (*See* Volume II, §§ 103.2 and 405).  To reiterate,

these options neither require a builder to use specific product, nor award credits based on the use

of a particular product.

Volume II contains two additional performance-based options.  First, a building is

exempted if it is certified to be in compliance with "Build Green New Mexico."  (*See* Volume II,

§ 103.2).  Like the options above, "Build Green New Mexico" neither requires a builder to use a

specific product, nor awards credits based on the use of a particular product.  Second, Volume II

provides for a performance-based option relative to a standard reference design.  (*See* Volume II,

---

[8]  The IECC is published by the International Code Council ("ICC").  The ICC is a United States organization that creates model building codes and other building related standards.  The majority of cities, counties and states in the United States have adopted codes developed by the ICC.

[9]  The copy of Volume II attached as Exhibit B to Plaintiffs' Complaint was amended before Plaintiffs filed their lawsuit.  Plaintiff's reference to this outdated version is confusing and should be ignored.

§ 404. ("Simulated Reference Design").  The Standard Reference Design criteria is set forth in Table 404.5.2(1).  An owner is not required to meet the design criteria set forth in the "Standard Reference Design" column of Table 404.5.2(1) if the owner can show that the energy cost of the proposed design is less than or equal to the annual energy cost of the standard reference design.[10] (Bucholz Aff., ¶¶ 38-40).

In order to take advantage of these performance-based options, owners must also comply with certain additional requirements labeled "Mandatory."  The use of the term "Mandatory" comes from the IECC and is distinguishable from prescriptive requirements in that the Mandatory terms impose some requirements but do *not* prescribe any particular energy efficiency of any appliance.   The Mandatory requirements includes such things as caulking and sealing around doors, adequately supporting the joints in ductwork, and other quality control issues.  (Bucholz Aff., ¶ 37).

Finally, Volume II contains a prescriptive option, which is set forth in Section 403.  This option provides owners with an option to avoid the performance-based alternatives of LEED, Build Green New Mexico, Section 404, and Section 405, if they so desire.  (Bucholz Aff., ¶ 41).  The prescriptive option does, in some cases, provide for energy efficiency standards for HVAC products in excess of the federal standards, although Plaintiffs acknowledge that these prescriptions are consistent with the most recent ASHRAE standards and will become effective January 1, 2010.  In any event, as noted, this is not by any means a mandatory option.

---

[10]   For example, the building component labeled "Mechanical ventilation" provides the following Standard Reference Design:  "Electric ventilation fans efficiencies:  In accordance with table 403.2 of this code."  If the owner decides not to utilize an electric ventilation fan that satisfies table 403.2, that owner if free to do so.  However, the owner will be required to make adjustments in other areas of the building to ensure that the overall energy cost of the building is less than or equal to the annual energy cost of the standard reference design.  Accordingly, Section 404 is a standard that applies to the overall performance of a building.  (Bucholz Aff., ¶ 40).

Below is a Table providing a general summary of the application of Volume II to the various circumstances involving HVAC and water heating installation and repair. The multiple compliance paths and limitations together provide meaningful alternatives for compliance in all circumstances.

| | Exemptions | | Alternative Compliance Paths | | | Other Exceptions/ Limitations |
|---|---|---|---|---|---|---|
| | LEED Silver or Build Green NM Exemption | Other Exemptions (Historic Buildings, Low Energy Buildings) | Section 403 – Prescriptive Option | Section 404 – Simulated Performance Alternative I (Component Performance Option) | Section 405 – Simulated Performance Alternative II (30% Reduction Option) | |
| New Construction | Yes, if also compliance with non-prescriptive mandatory provisions (103.2) | Yes (101.7.2; 101.8.2) | Available if also compliance with non-prescriptive mandatory provisions (403) | Available if also compliance with non-prescriptive mandatory provisions (404) | Available if also compliance with non-prescriptive mandatory provisions (405) | |
| Additions (101.7.3) | Yes, if also compliance with non-prescriptive mandatory provisions (103.2) | Yes (101.7.2; 101.8.2) | Available if also compliance with non-prescriptive mandatory provisions (403) | Available if also compliance with non-prescriptive mandatory provisions (404) | Available if also compliance with non-prescriptive mandatory provisions (405) | Additions need only comply as to the area of new construction, not entire building (101.7.3) |
| Substantial Alterations (50% or more is work area) (101.7.4) | Yes, if also compliance with non-prescriptive mandatory provisions (103.2) | Yes (101.7.2; 101.8.2) | Available if also compliance with non-prescriptive mandatory provisions (403) | Available if also compliance with non-prescriptive mandatory provisions (404) | Available if also compliance with non-prescriptive mandatory provisions (405) | |

|  | Exemptions | | Alternative Compliance Paths | | | Other Exceptions/ Limitations |
|---|---|---|---|---|---|---|
| **Alterations (101.7.3)** | Yes, if also compliance with non-prescriptive mandatory provisions (103.2) | Yes (101.7.2; 101.8.2) | Available if also compliance with non-prescriptive mandatory provisions (403) | Available if also compliance with non-prescriptive mandatory provisions (404) | Available if also compliance with non-prescriptive mandatory provisions (405) | |
| **Replacement (101.7.3)** | Yes, if also compliance with non-prescriptive mandatory provisions (103.2) | Yes (101.7.2; 101.8.2) | Available if also compliance with non-prescriptive mandatory provisions (403) | Available if also compliance with non-prescriptive mandatory provisions (404) | Available if also compliance with non-prescriptive mandatory provisions (405) | - Effective July 1, 2009 for furnaces and air conditioners (101.7.3(5))[11] |
| **Repair NOT COVERED** | N/A | N/A | N/A | N/A | N/A | N/A |

3.    The High Performance Building Ordinance

At the same time that the GRTF was meeting to discuss drafting of the Code, the Albuquerque City Council also began examining methods by which to reduce carbon emissions and increase energy efficiency in buildings.  In 2007, the Council developed and adopted the Albuquerque High Performance Buildings Ordinance (the "Ordinance"), which is attached to the Bucholz affidavit as Exhibit F.  The Ordinance is not as comprehensive in its application as Volumes I and II of the Code.  The Ordinance only applies to new buildings and existing buildings undergoing alteration when such the work area of the alteration exceeds 50% of the building area (a.k.a "substantial alterations").  (*See* Ordinance, § 3(A)); (Bucholz Aff., ¶¶ 42-45).

---

[11]   Furnace compliance not required where replacement would require extensive revisions to other systems, equipment (403.2).

For purposes of its impact on HVAC and water heating, the Ordinance sets several prescriptive standards for energy efficiency. (*See* Ordinance, §§ 3(F) and 3(J)). However, the Ordinance also requires Mr. Bucholz, as the Green Building Manager, to "establish alternative performance-based criteria for overall building energy conservation which may be used for compliance in lieu of the standards prescribed therein." (*See* Ordinance, § 3(A)(2)); (Bucholz Aff., ¶ 44).

Mr. Bucholz has indicated to much of the industry (including many of the Plaintiffs herein) that § 3(A)(2) of the Ordinance simply requires building officials to comply with Volumes I and II of the Code, including all of the performance-based and prescriptive requirements available therein. Consequently, the Ordinance simply has a "belt and suspenders" application. The Ordinance requires compliance with the Code, but it does not, as applied, impose any obligations that are not required by compliance with the Code. (Bucholz Aff., ¶ 45).

4.      Implementation of the Code and Ordinance

Except as otherwise noted, the Code and Ordinance provisions become effective on October 1, 2008. They will apply to new construction, additions, substantial alterations, alterations, and replacements of existing equipment. Each of these activities generally requires application for, and issuance of, some sort of permit, whether it be mechanical, electrical, or plumbing. Plaintiffs have yet to apply for any permits under the Code. (Bucholz Aff., ¶ 46).

The Code provisions were originally adopted in September 2007 and have been suspended several times as an accommodation to the industry – including Plaintiffs - in order to allow it time to prepare for implementation. (Bucholz Aff., ¶ 47).

## II.      THE CODE IS CONSISTENT WITH NATIONAL GREEN BUILDING INITIATIVES, INCLUDING THOSE REQUIRING LEED CERTIFICATION.

By imposing standards requiring compliance with LEED standards, the City has joined a growing number of energy conscious communities. Requirements for LEED certification are becoming common in the United States. According to the USGBC, LEED certification is required for privately-owned construction projects in several major cities, including but not limited to, Boston, Los Angeles, San Francisco, Baltimore, Palo Alto, Albany, and Annapolis.[12]

In Palo Alto, for example, the city council adopted an ordinance requiring all new commercial construction larger than 5,000 square feet to earn LEED Silver certification and all commercial renovations over 5,000 square feet or $500,000 to earn LEED Certified.[13] Likewise, in Boston, the Zoning Commission recently approved several amendments to the Boston Zoning Code to require all projects over 50,000 square-feet to meet LEED standards.[14] In San Francisco, the Mayor signed the San Francisco Green Building Ordinance, requiring proof of green building practices and LEED certification for all residential and commercial buildings in the city.[15] The Plaintiffs associations presumably have members located in each of these cities that are complying with these LEED standards.

## III.   PLAINTIFFS HAVE FAILED TO MEET THEIR HEAVY BURDEN OF PROVING THE NEED FOR A PRELIMINARY INJUNCTION.

Plaintiffs are not entitled to a preliminary injunction against enforcement of the City Code because they have failed to meet their heavy burden of showing that such a drastic

---

[12] *See* USGBC, http://www.usgbc.org/publicpolicy/searchpublicpolicies.aspx (last visited September 11, 2008)

[13] *See* http://www.cityofpaloalto.org/civica/filebank/blobdload.asp?BlobID=11912 (last visited September 11, 2008)

[14] *See* http://www.cityofboston.gov/bra/gbtf/GBTFhome.asp (last visited September 11, 2008)

[15] *See* http://www.sfgov.org/site/uploadedfiles/dbi/meeting_information/greenbuilding/agendas/2008/080063.pdf (last visited September 11, 2008)

equitable remedy is necessary and appropriate.  Courts in this Circuit have consistently recognized that "a preliminary injunction is an extraordinary remedy" that should only be granted where the movant's right to relief is "clear and unequivocal." *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001).  To prevent abuse of the remedy, the movant must establish: (1) a substantial likelihood of success on the merits; (2) irreparable injury if the preliminary injunction is denied; (3) the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction; and (4) the injunction is not adverse to the public interest. *See id.*  The rationale for this high burden is especially obvious in cases such as this where a small profit-driven interest group is trying to block authorized local regulations that are undeniably in the public interest by raising the specter of potentially losing business.

**A.     Plaintiffs Have Failed To Demonstrate That They Are Substantially Likely To Succeed.**

Plaintiffs frame this case as whether the City's Code fits within the exceptions to the preemption sections found within the federal laws concerning HVAC energy efficiency.  This includes portions of the Energy and Policy Conservation Act ("EPCA")[16] as amended by the National Appliance Energy Conservation Act of 1987 ("NAECA")[17] and Energy Policy Act of 1992 ("EPACT"),[18] and which preemption sections are found at 42 U.S.C. § 6297 ("Section 6297") and 42 U.S.C. § 6316 ("Section 6316").

In fact, these statutes do not even apply.  Their language makes clear that they only apply to a "regulation."  Section 6297(c) states, in pertinent part (with emphasis added):

---

[16]   42 U.S.C. § 6201 *et seq.* (2006).

[17]   Pub. L. No. 100-102 (1987).

[18]   Pub. L. No. 102-486 (1992).

> Except as provided in [sections omitted]..., effective on the
> effective date of an energy conservation standard established in or
> prescribed under section 6295 of this title for any covered product,
> no State *regulation* concerning the energy efficiency, energy use,
> or water use of such covered product shall be effective with respect
> to such product unless the regulation [exceptions omitted]...

Similarly, Section 6316(b)(2)(A) states, in pertinent part (with emphasis added):

> A standard prescribed or established under section 6313(a) of this
> title shall, beginning on the effective date of such standard,
> supersede any State or local *regulation* concerning the energy
> efficiency or energy use of a product for which a standard is
> prescribed or established pursuant to such section.

As explained above, the prescriptive standards within the Code are not "regulations" because they are by no means mandatory.[19]  They are merely alternative options to other avenues for compliance including LEED certification and other performance-based energy reduction options.  Indeed, for the prescriptive standards to be mandatory regulations, Plaintiffs would have to demonstrate that they had no reasonable alternative but to comply.  That plainly is not the case.  To hold otherwise would have the perverse effect of invalidating a City's LEED certification program because it provided alternative methods for compliance, when programs without such prescriptive options in other cities remain in effect and unchallenged.

There is nothing to suggest that Congress intended this result.  As the Supreme Court has said repeatedly, there is a presumption against preemption based on the assumption that the "historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485

---

[19]Black's Law Dictionary defines "regulation" as "the act or process of controlling by rule or restriction." *Black's Law Dictionary* 1311 (8th ed. 2004).  In turn, it defines "rule" as "an established and authoritative standard or principle" (*Id*. at 1357) and "restriction" as "a limitation or qualification" (*Id*. at 1341). Because the prescriptive standard is a meaningful alternative to other regulations, it is neither authoritative nor a limitation on Plaintiffs.

(1996). Accordingly, express preemption statutes are given narrow interpretations. *Id.; see also*

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992).

The seminal case on preemption of EPCA and NAECA (which is not cited by Plaintiffs

even though some of them were parties) is *Air Conditioning and Refrigeration Institute et al. v.*

*Energy Resources Conservation and Development Comm'n*, 410 F.3d 492 (9th Cir. 2005)

("*Energy Resources*").  There, the Ninth Circuit examined whether several California

requirements concerning disclosures and labeling were preempted under EPCA and NAECA,

where those federal statutes contained similar provisions.  Reading the statutes narrowly, the

Ninth Circuit held that the preemption of state laws concerning disclosure was limited to

disclosures made at point of sale and that state disclosure requirements concerning disclosures to

the state thus were not preempted.  *Id.* at 497-500.  Similarly, the Ninth Circuit held that EPCA's

preemption of labeling concerning energy efficiency was too "indirect, remote, and tenuous" to

the state's requirement that labeling include "the manufacturer's name, the model name, and the

date of manufacture." *Id.* at 502.  The Court reversed the district court's finding that the

regulations were preempted and, importantly, vacated the district court's preliminary and

permanent injunctions preventing application of the state regulations.  *Id.* at 505.

The rationale of *Energy Resources* cuts squarely against Plaintiffs in this case, just as it

cut against them there.  As noted, the statutes at issue prohibit "regulations" that would require

Plaintiffs to follow the prescriptive standards.  That is not the case.  Plaintiffs have other

meaningful options for compliance, which options they presumably are following today in cities

that require LEED and similar certifications.[20]

---

[20]  As Plaintiffs note in their brief, the performance-based options set forth in Volume II require compliance with certain standards entitled "Mandatory."  As discussed above, these Mandatory standards are not prescriptive as they do not identify energy efficiency standards for any products addressed by federal law.  Plaintiffs nevertheless contend that sections 403.3 and 403.9.3 are prescriptive because they

**B.**      **Plaintiffs Have Failed to Demonstrate That Their Claims Are Ripe.**

Plaintiffs additionally are not entitled to a preliminary injunction because their claims are not yet ripe for adjudication.  The Code will not go into effect until October 1, 2008.  Because the Code has not yet gone into effect -- let alone been applied to Plaintiffs or otherwise enforced – Plaintiffs have neither suffered any actual harm nor face any imminent risk of harm.

The Supreme Court has long made clear that, in order to obtain injunctive relief, there must exist, at the very least, some cognizable danger of irreparable harm if the defendant is not enjoined from taking certain actions.  *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (recognizing that "mere possibility" of future harm is insufficient).

The precedent cited by Plaintiffs makes clear that their suit to enjoin "enforcement of the challenged provisions of the City Ordinances," (Pl. Mot. at 30), is not ripe because the City has not sought to apply the ordinance against Plaintiffs or bring any type of enforcement action against the Plaintiffs for violating the ordinances in question.  In *Morales v. Transworld World Airlines*, the Supreme Court recognized that in a "first strike suit to prevent a State from initiating a suit of its own, the prospect of state suit must be imminent for it is the prospect of that suit which supplies the necessary irreparable injury." 504 U.S. 374, 382 (1992) (internal quotations omitted).  Far from enforcement being imminent, Plaintiffs have not even applied for a permit, and have no idea whether the Code -- which contains a built-in system to ensure appropriate case-by-case application -- would be adversely applied to them.

That harm to the Plaintiffs is uncertain is further underscored by the plain mischaracterization of the application of the Code provisions in Plaintiffs' Motion, which

---

ban the use of the entire product lines of electric-resistance heating and water heating after January 1, 2009.  However, for the reasons outlined in *Energy Resources*, there is nothing in the federal preemption statutes concerning minimum energy efficiency standards that would bar a state from using its police power to ban a product.  The federal acts do not require states to allow any particular products to be sold.

presumably is based on their misunderstanding as to how it will apply and the many exceptions it provides.  Given the state of affairs, the Court should adhere to the Supreme Court's admonition that federal courts "should refrain from entangling themselves in abstract disagreements over administrative policies . . . until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967); *cf., American Conveyor Corp. v. Municipality of Guanica*, 614 F. Supp. 922, 925 (D.P.R. 1985) (before challenging state action in federal court, litigant must exhaust state administrative and legislative remedies); *see also* Moore's Federal Practice, § 65.06[4].

C.    **Plaintiffs Have Failed To Demonstrate They Will Suffer Irreparable Harm In The Absence Of An Injunction.**

Further foreclosing Plaintiffs request for a preliminary injunction is the simple fact that Plaintiffs have failed to demonstrate that they would suffer *irreparable harm* if not granted the drastic remedy of an injunction.  Indeed, Plaintiffs have failed to establish that they have suffered or would suffer any actual harm at all.[21]

In order to obtain a preliminary injunction from a federal court in this circuit, plaintiffs must demonstrate that they would suffer "irreparable injury" if the preliminary injunction were denied.  *Kikumura v. Hurley*, 242 F.3d 950, 954 (10th Cir. 2001).  But an injury may only be deemed irreparable when the court would be "unable to grant an effective monetary remedy after

---

[21] Although Plaintiffs assert they have already suffered harm as a result of the uncertainty associated with the delayed enactment of the ordinances, such claims must be recognized as hollow, because it is Plaintiffs who have caused the very delay about which they complain.  Indeed, the President of the Heating Airconditioning & Refrigeration Distributors International has bragged to his affiliates that the HVAC community forced the City to delay enactment of the ordinances.  *See* Letter from Talbot Gee, President of the Heating Airconditioning & Refrigeration Distributors International, dated April 1, 2008 ("[T]hanks to overwhelming pressure from the local HVAC community, their residential and commercial customers and the industry's manufacturing, distribution and contractor national associations the city pushed back the effective date to July 1, 2008 to provide time to potentially amend the codes.").  Available at <Http://www.abqwinair.com/2008p6.htm>(last visited Sept. 8, 2008).

a full trial because such damages would be inadequate or difficult to ascertain." *Id.* at 963.

Here, because Plaintiffs have not shown that they could not seek money damages as

compensation for any harms they would suffer, they are not entitled to an injunction.

        1.    Plaintiffs' Affidavits Allege Only Speculative And Theoretical Harm.

Although Plaintiffs pay lip service to established legal authority recognizing that

preliminary injunctions should only be granted where the alleged future injury is "certain, great,

actual and not theoretical," (Plaintiffs' PI Motion at 23 (quoting *Heideman v. South Salt Lake*

*City*, 348 F.3d 1182, 1189 (10th Cir. 2003)) (internal quotations omitted)), they have plainly

failed in their own pleadings to demonstrate any such concrete harm.

The boilerplate affidavits advanced by Plaintiffs are rife with wild speculation about the

effects of the Code. One affiant supposes that "[i]n [his] opinion, an increasing number of

property owners and installers will simply throw up their ands and "fly under the radar," creating

a black market of unpermitted work." (*See* Affidavit of Mike Salmon in Supp. of Prelim.

Injunction ("Salmon Aff.") ¶13). After purporting to calculate the additional costs that he would

charge five hypothetical customers to install equipment compliant with the new Code,[22] he goes

on to state, "[i]n [his] opinion," that "customers interested in remodeling may choose not to

replace existing heating and air conditioning units in view of the increased price." *Id.* ¶ 15

(emphasis added). Plaintiffs' other affidavits make similarly unfounded suppositions about how

Albuquerque residents will react to the new ordinances. (*See e.g.*, Affidavit of David Perry in

Supp. of Mot. For Prelim. Injunction ¶¶ 20-21 (speculating that homeowners will seek to

circumvent the regulations or make dangerous do-it-yourself repairs); Affidavit of Ed Donahue

---

[22] Of course, even Plaintiffs' own calculations of his rates are speculative, because a competitive market for the installation of high-efficiency equipment in Albuquerque does not yet exist because the Code has not yet gone into effect.

in Supp. of Mot. For Prelim. Injunction ¶¶ 12-15 (same)).  In the absence of any reasonable basis for their doomsday predictions—or an explanation of why this court should credit Plaintiffs' claims about what Albuquerque residents will do rather than the crediting the claims of the residents' actual elected representatives—Plaintiffs' allegations of future harm remain merely theoretical and insufficient.

Plaintiffs' dire predictions regarding the consequences of the City Code also run counter to the experiences of other cities that have adopted similar green building ordinances and the HVAC industry projections of the Department of Labor.  According to one industry commentator, "approximately 90 cities, 29 counties, and 20 towns across the United States have adopted some type of green building program."[23]  Yet, Plaintiffs have not shown that any of the consequences they predict have actually occurred in any of these similarly situated cities.  Moreover, Plaintiffs' predictions regarding the effects of these ordinances upon their business are contrary to the projections of the federal Bureau of Labor Statistics, which predicts that the HVAC industry will thrive in coming years, due in part to the increased demand for environmentally-friendly, high-efficiency products and the qualified persons who can properly install these complex machines.  *See generally*, U.S. Dept. of Labor, Bureau of Labor Statistics, Occupational Outlook Handbook 2008-2009, Report on Heating, Air-Conditioning, and Refrigeration Mechanics and Installers.[24]

      2.    <u>Even If Accurately Forecast, The Types of Economic Harms Alleged By Plaintiffs Are Plainly Not Irreparable.</u>

---

[23] *See* Website of Climate Change Practice at Akin Gump Strauss Hauer & Feld, LLP at <Http://climateintel.com/2008/07/30/hvac-industry-groups-sue-to-block-green-building-codes-in-albuquerque/> (Last visited Sept. 8, 2008).

[24] <Http://www.bls.gov/oco/ocos192.htm> (Last visited Sept. 8, 2008).

To the extent Plaintiffs have identified any non-speculative harms, such harms cannot support the equitable remedy of a preliminary injunction, which is only available when the movant has no adequate remedy at law.  Here, Plaintiffs can clearly seek after-the-fact compensation through the award of money damages.  *See* Moore's Federal Practice § 65.22[1][b] (collecting cases holding that an irreparable injury is an injury for which the court could not compensate the movant should the movant prevail in the final decree.).

Plaintiffs may seek adequate after-the-fact compensation for the litany of potential future economic harms they allege in their motion and supporting affidavit.   Plaintiffs assert that if the Codes goes into effect, they will lose revenue, (Plaintiffs' PI Motion, at 25), be required to purchase expensive higher-efficiency equipment, (Salmon Aff. ¶ 23), and/or be forced to obtain additional storage space for the allegedly larger equipment (Affidavit of John Richardson in Supp. of Mot. for Prelim. Injunction ¶ 12).

The City vigorously disputes Plaintiffs' unsupported contentions that enactment of the Code result will in a decrease of HVAC sales and revenue.  Although high-efficiency equipment may have higher initial costs, the long term savings supplied by higher efficiency equipment supplies an overwhelming financial benefit to consumers that have kept (and will keep) the demand for new efficiency appliances high.  Industry commentators, citing reports from reputable market research firms and the Association of Home Appliance Manufacturers, have recognized that high efficiency appliances are "significantly outselling their less-efficient

counterparts despite steep price premiums."[25]  One of the Plaintiffs' own websites also

acknowledges an "upswing in the demand for 90+ [percent efficient gas furnace] models."[26]

Yet, even if Plaintiffs would sustain economic hardship as a result of this public interest

legislation, such claims of lost income or other economic loss that are compensable by monetary

damages do not constitute irreparable injury in this circuit.  *See e.g.*, *Heideman*, 348 F.3d at 1189

(recognizing that "simple economic loss usually does not, in and of itself, constitute irreparable

harm" warranting preliminary injunction since such losses are compensable by monetary

damages); *Port City Properties v. Union Pacific R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008)

(affirming denial of preliminary injunction where plaintiff's alleged loss of business could be

compensated with money damages); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d

797, 801-02 (3d Cir. 1989) (loss of even 80% of business revenue not irreparable).

Plaintiffs' other predicted harms, even if they were to come into being and be traced to

the City Code,[27] are similarly not irreparable.  Any alleged harm caused by carrying additional

inventory—even were it not the case that some of the Plaintiffs are already "proud" to carry this

higher-efficiency equipment[28]—could always be remedied by reselling the higher efficiency

equipment and seeking to hold the city liable for any deficiency.  The cost of additional storage

space could also be easily reimbursed, if such relief were deemed appropriate.

---

[25] *See* Alan Wood, This Week in Consumer Electronics, Sept. 5, 2008.  Available online at
<Http://www.twice.com/index.asp?layout=articlePrint&articleID=CA6593518> (Last visited Sept. 8,
2008).

[26]  *See* site of plaintiff Anderson Air Corps, http://www.andersonaircorps.com/heating2.shtml (last visited
Sept. 8, 2008).

[27] The City does not concede any responsibility for any of these alleged harms and would contest liability
with all available defenses.

[28] *See e.g.*, Website of Plaintiff Albuquerque Winair Co. (advertising that it is "proud to be exclusively
selling high efficiency Baxi Boilers, stocking 80% Baxi Luna models and 90% condensing HT models.")
Available at <http://www.abqwinair.com/about.htm> (Last visited Sept. 8, 2008).

3.   Plaintiffs' Claims That They Will Lose Customer Goodwill As A Result Of The Regulations Is Unsupported By The Facts And Belied By Their Own Advertising.

Just about the only category of alleged future harm that could be potentially deemed irreparable is the loss of customer goodwill, which these Plaintiffs not only fail to support with any credible facts and but also contradict with their own advertising.

In an apparent attempt to invoke this Court's holding *in Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149 (10th Cir. 2001), Plaintiffs make contorted arguments to have this court believe that, by selling high-efficiency products, they would suffer a loss of consumer loyalty and goodwill.  (Pl. Mot. at 28).  But clearly, *Dominion Video* cannot be applied to the dissimilar facts presently before this court.  Dominion Video was launching a start-up business and had told subscribers that their satellite dish would be activated within three days of contacting Dominion Video after purchase.  *Id.* at 1156.  Accordingly, when EchoStar refused to activate new Dominion Video subscribers it was no wonder that loss of customer goodwill might result.  Indeed, Dominion Video—unlike the Plaintiffs at present—demonstrated that they had lost already lost five hundred customers.  *Id.*  Because these Plaintiffs have not made similar representations to their customers and have adduced no facts to demonstrate they would actually lose customers by carrying high efficiency equipment, *Dominion Video* lends no support to Plaintiffs' claim.

Plaintiffs very own advertising also belies their claim that requiring them to sell high-efficiency appliances will harm customer goodwill.  On its website homepage, Plaintiff Johnstone Supply proclaims:

> Energy-efficiency is the name of the game in today's business environment. Increase your sales and profitability by recommending and installing energy savings parts and equipment

from Johnstone Supply. You'll help save the environment and create customer loyalty.[29]

Because Plaintiffs own advertising concedes that carrying high-efficiency products will help, rather than hurt, their customer goodwill, it exposes their injunctive claims for what they are: hollow and absurd.

**D.    Plaintiffs Have Failed To Demonstrate That Balancing of Hardships Favors Them.**

As explained above, Plaintiffs' allegations of harm to them resulting from complying with the Code provisions are not only unsupported but are contradicted by their marketing materials and the fact that the associations' members already are complying with similar codes in other portions of the country.  Completely absent, of course, is any attempt by Plaintiffs to calculate the harm to the City, its residents, and worldwide.

In the Report of Working Group I of the Intergovernmental Panel on Climate Change ("IPCC"), the IPCC made the following conclusions in its "Summary for Policymakers:" [30] carbon dioxide is the most important of the greenhouse gases (p. 2); the atmospheric concentration of carbon dioxide in 2005 exceeds by far the natural range over the last 650,000 years (*Id.*); the annual carbon dioxide concentration growth rate was larger from 1995-2005 than it has been since the beginning of measurements in 1960 (*Id.*); the primary source of the increased atmospheric concentration of carbon dioxide results from fossil fuel use (*Id.*); as a result of this increase, there is a 90% chance that global average net effect of human activities has caused warming (*Id.*  at p. 3); warming of the Earth is unequivocal, as is evident from observations of increases in global average air and ocean temperatures, widespread melting of

---

[29]   See http://www.johnstonesupply.com/corp/Default.aspx (last visited Sept. 12, 2008).

[30]   See IPCC website at http://www.ipcc.ch/press/index.htm (last visited Sept. 12, 2008).

snow and ice, and rising global sea level (*Id.* at p. 5).  The IPCC concluded that continued

greenhouse gas emissions at or above current rates would cause further warming and induce

many changes in the global climate system during the 21st Century that would very likely be

larger than those observed during the 20th Century.  (*Id.* at p. 13).  This included the virtual

certainty of warmer days and nights over most land areas, the very likelihood of frequent heat

waves and heavy precipitation events, and the likelihood of drought, increased tropical cyclones,

and higher sea levels.  (*Id.*  at p. 8).

Implementation of the Code obviously will not by itself remedy global warming.

However, in the more recent report of IPCC Working Group III, the "Summary of Policymakers"

section[31] notes that carbon emission mitigation actions have started to work and can continue to

work to reduce carbon emissions and combat global warming.  The IPCC notes that the largest

growth in greenhouse gases has come from the energy supply sector and that the buildings sector

has a very high level of electricity use.  (*Id.*  at p. 3).  The IPCC further notes that there is a

substantial potential for the mitigation of global greenhouse emissions.  (*Id.* at p. 9).

Specifically, the IPCC notes that "energy efficiency options for new and existing buildings could

considerably reduce $CO_2$ emissions with net economic benefit."  (*Id.*  at p. 13).

Delay of implementation of the City's Code for the year that this case may take to be

decided is not simply an issue of an additional year of emissions at current levels.  Rather, by

delaying implementation, there is a good chance that the City may forever lose the ability to

control emissions resulting from newly-built inefficient buildings over the life of the building.

That means that one year of delay could result in 20 years or more of excess emissions for any

given building.  Further, implementation of the City's Code hopefully will continue to encourage

---

[31]   See IPCC website at http://www.ipcc.ch/press/index.htm (last visited Sept. 12, 2008).

communities to enact similar codes aimed at reducing carbon emissions, thus collectively increasing the impact. On the other hand, suspension of the Code, even for the life of this lawsuit, very well could have a chilling effect and work against the recommendation of the IPCC.

**E.     Plaintiffs Have Failed To Demonstrate That It Is In The Public Interest To Preliminarily Enjoin Building Codes Adopted By The City Council.**

The final consideration weighing heavily against the grant of a preliminary injunction in this case is the fact that this special interest group has not and cannot show that a preliminary injunction would be consistent with the wider public interest. Although Plaintiffs attempt to frame the instant injunction as an effort to prevent economic losses completely, they fail to recognize the fact that an injunction would simply continue the practice of forcing the public to internalize the costs of Plaintiffs current environmentally-damaging business practices.

It is a fundamental premise of our representative democracy and established jurisprudence that laws passed by elected officials are presumptively enacted in furtherance of the public interest. For this reason, federal courts in this jurisdiction and all others apply only rational basis scrutiny when analyzing the constitutionality of most laws. Courts have also therefore looked to the acts and pronouncements of local legislature to assess the public interest in determining whether to grant or deny an injunction. *See e.g., Schulz v. U.S. Boxing Ass'n*, 105 F.3d 127, 134 (3d Cir. 1997) (turning to enactments of state legislature as authoritative source of state public policy, when considering effects of preliminary injunction on public interest). Here, Plaintiffs cannot deny that the elected officials of the City of Albuquerque are in the best position to know what is consistent with the public interest.

**F.     Even If The Code Triggered Federal Law, Volume II At A Minimum Satisfies The NAECA Exceptions To The Extent It Concerns New Construction.**

For the reasons set forth above, Plaintiffs have failed to show that they are substantially likely to succeed on the merits and that they otherwise are entitled to a preliminary injunction. However, if for some reason, they could show that the federal acts had some application here, it cannot seriously be disputed that Volume II of the Code (pertaining to residential buildings) satisfies the preemption exception established by NAECA in 42 U.S.C. 6297(f)(3)(A-G) to the extent it concerns new construction.  Therefore, although an injunction is improper for many reasons, no injunction should impact Volume II as it applies to new construction.

      1.     <u>Volume II Satisfies § 6297(f)(3)(A) Because an Applicant Can Select Products Whose Combined Energy Efficiencies Satisfy the Performance-Based Options of LEED, Build Green NM, or the Simulated Performance Alternatives</u>.

The first prong of NAECA's preemption exception requires building codes to provide applicants with a performance-based option for compliance that specifies an overall energy consumption objective.  Specifically, § 6297(f)(3)(A) provides:

> The code [must] permit[] a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.

Volume II meets this requirement in three independent ways.  First, an applicant can satisfy the Code by constructing residences that comply with LEED for Homes or Build Green NM.  (Bucholz Aff., Exh. C, § 103.2).  These certification programs neither require a builder to use a specific product, nor award credits based on the use of a particular product.  (Bucholz Aff., ¶ 36).  Rather, they set forth an overall objective for a residence (Silver certification in this case), and provide the builder will flexibility to select *any* collection of systems that satisfy the overall objective.  (Bucholz Aff., ¶¶12-14).

Second, applicants can satisfy the Code by constructing residences pursuant to the performance-based option established in Section 404.  (Bulcholz Aff., Exh. C, § 404).  Section

404 of the Code establishes a baseline design with an overall energy efficiency. *Id.* The criteria

for the baseline design is set forth in the second column of Table 404.5.2(1) entitled, "Standard

Reference Design." *Id.* Although Table 404.5.2(1) establishes design criteria, an applicant is *not*

required to meet any individual design standards set forth in the "Standard Reference Design"

column. (*See* Bulcholz Aff., Exh. E, § 404.3).   Indeed, if the applicant's proposed design fails to

meet any part of the Standard Reference Design, the applicant can still satisfy Section 404 by

showing that the proposed design has "an annual energy cost that is less than or equal to the

annual energy cost of the standard reference design." *Id.* Thus, Section 404 provides an

applicant with an overall objective, and an applicant can satisfy the Code by selecting items

whose combined energy efficiencies meet that objective. *Id.*

Third, an applicant can satisfy the Code by constructing residences pursuant to the

simulated performance option established in Section 405. (*See* Bulcholz Aff., Exh. C, § 405).

An applicant satisfies this Section if the "proposed residence [is] 30% more energy efficient than

a baseline residence." (*Id.* at § 405.3).   The baseline residence is defined in Chapter 2 of the

Code as "a residence that meets the minimum requirements of the 2003 International Energy

Conservation Code." (*Id.* at § 202).   Thus, Section 405 provides an applicant with the 30%

efficiency objective, and an applicant can meet the objective by designing a package whose

combined energy efficiencies meet that objective. *Id.*

Plaintiffs argue that Volume II does not comply with § 6297(f)(3)(A) because "[n]o

method is provided for selecting 'items' with combined energy efficiencies[.]" (*See* Plaintiffs'

PI, at 18).   Plaintiffs argument plainly misreads the statute.   The plain language of §

6297(f)(3)(A) does not require the Code to provide Plaintiffs with a list of potential products that

Plaintiffs must use to achieve an energy objective.   Instead, the Code must only provide a

specific energy consumption or conservation objective; from that point forward, it is up to the applicant to select products that will achieve that objective. *See* § 6297(f)(3)(A). The performance-based options above clearly satisfy that requirement.

In addition, even if § 6297(f)(3)(A) did require the Code to provide specific items for applicants to choose from, Section 404 does just that. Section 404 provides a list of items from the Standard Reference Design that, when combined, meet the overall energy design objective. (*See* Bulcholz Aff., Exh. C, § Table 404.5.2(1)). An applicant can either choose to use that design criteria, or it can submit an alternative design that meets the same overall energy objective. (*See* Bulcholz Aff., Exh. E, § 404.3).

    2.    <u>Volume II Satisfies § 6297(f)(3)(B) Because It Does Not Require An Applicant to Use a Product With An Energy Efficiency Exceeding Federal Limits.</u>

The second prong of NAECA's exception provides, in relevant part, that a code cannot require an applicant to use a product with energy efficiency limits greater than federal law. Specifically, § 6297(f)(3)(B) provides (with emphasis added):

> The code [cannot] <u>require</u> that the covered product have an energy efficiency exceeding the applicable energy conservation standard established in or prescribed under Section 6295 of this title, except that the required efficiency may exceed such standard up to the level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d) of this section.

Volume II satisfies § 6297(f)(3)(B) because it does not require an applicant to use a product with an energy efficiency exceeding standards in § 6295. Plaintiffs' argument to the contrary again is based on a misinterpretation of the Code. (*See* Plaintiffs' PI Motion, at 18). Plaintiffs argue that § 404 of the Code requires compliance with Table 404.5.2.1, which requires compliance with prescriptive standards established in Tables 403.2 and 403.9.2. *Id.* However, Section 404.3 of the 2006 IECC, incorporated into the Code by reference, specifically provides

that the design criteria set forth in the Standard Reference Design column of Table 404.5.2.1 is

not mandatory. (*See* Bulcholz Aff., Exh. E, § 404.3). Indeed, pursuant to § 404.3, an applicant

is not required to comply with the design criteria of the Standard Reference Design column in

Table 404.5.2.1 if the applicant's proposed design has an "annual energy cost [that] is less than

equal or equal to the annual energy cost of the standard reference design." *Id.* Therefore,

Section 404 does not require the use of *any* product, let alone a product with a specific energy

efficiency.

Plaintiffs also argue that the Code fails to satisfy § 6297(f)(3)(B) because *one* of the

"Mandatory" provisions in the Code, § 403.9.3, outlaws the use of electric resistance water

heaters that are permitted under federal law. (*See* Plaintiffs' PI Motion, at 19). Again, Plaintiffs'

argument is based on a misinterpretation of the law. Section 6297(f)(3)(B) prohibits building

codes from requiring a "product to have an energy efficiency *exceeding* the applicable energy

conservation standard." Emphasis Added. Here, the Code does not require electric water heaters

to have an energy efficiency *exceeding* the applicable conservation standard. Rather, it simply

eliminates the use of such product. This is wholly permissible.[32]

        3.      <u>Volume II Satisfies § 6297(f)(3)(C) Because It Gives One-For-One Credit For Like Products</u>.

The third prong of NAECA's exception provides that codes must give equal credit to the

energy consumption objective for products that are one-for-one equivalents. Specifically, §

6297(f)(3)(C) provides:

> The credit to the energy consumption or conservation objective
> allowed by the Code for installing covered products having energy
> efficiencies exceeding such energy conservation standard
> established in or prescribed under Section 6295 of this title or the
> efficiency level required in a State regulation referred to in

---

[32] *See* Footnote 20, *infra.*

subparagraph (B) is on a one-for-one equivalent energy use or
equivalent cost basis.

Volume II satisfies this requirement because it does not discriminate between different

products, or products with different energy efficiencies.  It treats all like products as one-for-one

equivalents.  Plaintiffs have failed to point out any place in the Code where a one-for-one trade-

off is not permitted for equivalent products. (*See* Plaintiffs' PI Motion, at 19 )(stating, without

providing any examples, that "[n]othing in Alternative I or Alternative II provides for . . . a one-

for-one trade-off or credit[.]").   Indeed, there is none.  If an applicant is attempting to meet an

energy conservation objective -- such as a proposed residence that is 30% more efficient than the

baseline -- that applicant will receive one-for-one credit for covered products that contain

equivalent energy efficiencies.  (*See* Bulcholz Aff., Exh. C, § 405).  This is true regardless of

whether the applicant is attempting to obtain LEED certification or compliance under the

Simulated Energy Performance Alternatives.

> 4.    Section  6297(f)(3)(D) Does Not Apply Here Because All Submitted
>       Buildings Designs Are Not Evaluated Against Baseline Designs.

The fourth prong of NAECA's exception provides that – if *all* submitted building designs

are to be evaluated against baseline designs – the baseline building designs cannot contain

covered products with efficiency levels differing from federal limits.  Specifically, §

6297(f)(3)(D) provides (with emphasis added):

> If the code uses one or more baseline building designs against
> which all submitted building designs are to be evaluated and such
> baseline building designs contain a covered product subject to an
> energy conservation standard established in or prescribed under
> section 6295 of this title, the baseline building designs are based on
> the efficiency level for such covered product which meets but does
> not exceed such standard or the efficiency level required by a
> regulation of that State for which the Secretary has issued a rule
> granting a waiver under subsection (d) of this section.

The plain language of § 6297(f)(3)(D) is clear and unambiguous: the constraint on efficiency levels for covered products applies *only if* "all submitted building designs are to be evaluated" against baseline designs. *Id.* (emphasis added).  Here, the Code contains two avenues for compliance that do *not* include baseline designs:  LEED for Homes, and Green Build NM.  (*See* Bulcholz Aff., Exh. C  § 103.2).  Because all submitted building designs are not evaluated against baseline designs, § 6297(f)(3)(D) does not apply.

Moreover, in this case, the standard of which Plaintiffs complain are actually *below* federal standards.  (*See* Plaintiffs' PI Motion, at 19).  The intent of this section obviously was to prevent mandatory levels above federal minimum levels.  It is ironic, indeed, for Plaintiffs to challenge application of the exemption based on a standard that is below what the federal law requires and what they therefore must comply with anyway.

>    5.    Volume II Satisfies § 6297(f)(3)(F) Because the Baseline Objectives Are Specified in Terms of an Estimated Total Consumption of Energy.

The sixth prong[33] of NAECA's exception requires that any baseline energy conservation objective be established in terms of an estimated total consumption of energy and specified in units of energy or its equivalent cost.  Specifically, § 6297(f)(3)(F) provides:

> The energy consumption or conservation objective [must be] specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).

Plaintiffs' conclusively argue that "[n]either Alternative I [i.e., Section 404] nor Alternative II [i.e., Section 405] states how energy consumption is to be measured[.]"  Plaintiffs are ignoring key provisions in the Code that specifically address their concerns.  Section 405

---

[33] Plaintiffs concede that Volume II satisfies the fifth prong, 42 U.S.C. § 6297(f)(3)(E). (*See* Plaintiffs' PI Motion, at 20).

requires that a "proposed residence be 30% more energy efficient than the baseline residence [in

the 2003 IECC]." (*See* Bulcholz Aff., Exh. C, § 405.3). Section 402.2.1 of the 2003 IECC,

entitled "**Standard Design**," provides that any energy analysis must be specified in terms of the

"calculated annual energy consumption." (*See* Bulcholz Aff., Exh. E, § 402.2). Sections 402.3.1

and 402.3.2 provide that the annual energy consumption must be specified in equivalent units of

energy:

> **402.3.1 Units of energy.** The comparison [of the standard design
> with the proposed design] shall be expressed as Btu input per
> square foot (W/m^2) of gross floor area per year at the building
> site.
>
> **402.3.2 Equivalent energy units.** If the proposed design results in
> an increase in consumption of one energy source and a decrease in
> another energy source, even though similar sources are used for
> similar purposes, the difference in each energy source shall be
> converted to equivalent energy units for purposes of comparing the
> total energy used.

Thus, the baseline residence in Section 405 is specified in terms of an estimated total

consumption of energy utilizing equivalent units of energy.[34]

> 6.    Volume II Satisfies § 6297(f)(3)(G) Because the Code Does Not Require
>       Testing Procedures Outside of Those Established in § 6293.

The seventh prong of NAECA's exception requires that building codes do not use testing

procedures that conflict with the testing procedures set forth in 42 U.S.C. § 6293. Specifically, §

6297(f)(3)(G) provides:

> The estimated energy use of any covered product permitted or
> required in the code, or used in calculating the objective, is
> determined using the applicable test procedures prescribed under
> section 6293 of this title, except that the State may permit the
> estimated energy use calculation to be adjusted to reflect the
> conditions of the areas where the code is being applied if such

---

[34] Section 404 also complies with § 6297(f)(3)(F). Sections 404.3 and 404.4 of the 2006 IECC set
forth the annual energy consumption objective in terms of an estimated equivalent energy cost.

> adjustment is based on the use of the applicable test procedures
> prescribed under  section 6293 of this title or other technically
> accurate documented procedure.

Plaintiffs argue, without pointing to *any* examples, that the Code requires testing procedures that conflict with § 6293's testing procedures. *See* Plaintiff's PI, at 20. This is incorrect. Chapter 6 of the 2006 IECC, entitled "Reference Standards," explicitly adopts relevant testing procedures of the United States Department of Energy, which were promulgated pursuant to § 6293. (*See* Bulcholz Aff., Exh. D, Chapter 6). The City is not aware of any procedures in the 2006 IECC that conflict with testing procedures established in § 6293. (*See* Bulcholz Aff. at ¶ 37). In fact, City officials assume that building products are tested in accordance with federal law. *Id.* Therefore, the Code satisfies § 6297(f)(3)(G).

       7.      <u>The High Performance Buildings Ordinance Also Complies With §</u>
              <u>6297(f)(3) To Extent It Covers Residential New Construction.</u>

As already discussed, the reach of the City's High Performance Building Ordinance does not extend any further than the Code. Therefore, the Ordinance satisfies § 6297(f)(3) to the same extent Volume II satisfies § 6297(f)(3) for purposes of residential construction.

## IV.    CONCLUSION

The City's Code provides meaningful alternative paths for compliance and thus is not subject to federal preemption. Indeed, in many regards the Code is less restrictive than those requiring LEED certification adopted by other cities. In any event, Plaintiffs plainly have not shown that they are likely to succeed on their claim that the Code is preempted, particularly when they have not applied for any permits and do not seem to appreciate the Code's many avenues for compliance. Plaintiffs otherwise have not made any cognizable showing of injury that is irreparable, which they clearly cannot do when they stock and sell the same energy efficiency products that they contend the Code requires them to install. Further, the balancing of

harms caused by a preliminary injunction clearly favors the City, as global warming caused by carbon emissions related to building energy use is a serious issue that can only be mitigated by aggressive policies such as these.  Finally, even if the Court for some reason believed an injunction were proper, it should be narrowly tailored to save application to new construction for residences.  For these reasons, Plaintiffs' motion should be denied.


STOEL RIVES LLP

By: /s/ Thomas W. Snyder
Thomas W. Snyder
999 18th Street, Suite 2700
Denver, CO 80202
(303) 297-7884
twsnyder@stoel.com

Adam J. Richins
101 S. Capitol Blvd., Suite 1900
Boise, ID 83702
(208) 389-9000
ajrichins@stoel.com

Jeremy D. Sacks
Bruce W. Klaw
900 SW Fifth Ave., Suite 2600
Portland, OR  97204
(503) 224-3380
jdsacks@stoel.com
bwklaw@stoel.com

CITY OF ALBUQUERQUE
Robert M. White, City Attorney

John E. DuBois
Assistant City Attorney
Post Office Box 2248
Albuquerque, New Mexico  87103
(505) 768-4500
jdubois@cabq.gov


Attorneys for City of Albuquerque

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 12, 2008, I filed the foregoing

**DEFENDANT'S RESPONSE  IN OPPOSITION TO MOTION FOR PRELIMINARY**

**INJUNCTION** electronically through the CM/ECF system, which caused the following parties

or counsel to be served by electronic means, as more fully reflected in the Notice of Electronic

Filing:

John R. Cooney – _jrcooney@modrall.com_

Leslie M. Padilla – lpadilla@modrall.com

Douglas Baker – dbaker@modrall.com

Attorneys for Plaintiffs

STOEL RIVES LLP

By _____

Adam J. Richins
101 S. Capitol Blvd., Suite 1900
Boise, ID 83702
(208) 389-9000
ajrichins@stoel.com