# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

THE AIR CONDITIONING, HEATING AND
REFRIGERATION INSTITUTE; et al.,

Plaintiffs,

v.                                                    No. CIV-08-633 MV/RLP

CITY OF ALBUQUERQUE,

Defendant.

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

Once the veneer of the City Ordinances' "alternatives to compliance" is peeled back and the paeans

to the alleged due process of the "Green Ribbon Task Force" are shown to be nothing more than after-the-

fact efforts to portray the Task Force as an open, deliberative body (when it was in fact never open to

Plaintiffs)[1], what remains of the City's Response is this:  an unmistakable set of <u>prescriptive</u> energy

efficiency standards that the City acknowledges are more stringent than federal standards, preempted by

federal law and housed in an unconstitutionally vague law.  Nothing in the federal statute that preempts

state and local regulations "concerning energy efficiency or energy use . . . of covered products," 42 U.S.C.

§§ 6297(f)(3) and 6316(b), permits the City to adopt regulations that impose standards more stringent than

federal minimum standards simply because the City also permits "alternative" means of compliance.  By

including such more stringent standards, the challenged provisions of the City Ordinances are preempted.

The City attempts to circumvent EPCA's express preemption while preventing the use of generally

less-expensive HVAC products and water heaters that meet but do not exceed federal minimum standards.

The City tries to do through the back door what it cannot do through the front.  It is easiest to see this by

looking at the replacement of HVAC and water heating units in existing residential dwellings.  None of the

---

[1]  See Affidavit of William Howland ("Howland Aff.") ¶ 7 (hereby attached as Exhibit A); Supplement Affidavit of John Richardson ("Richardson Suppl. Aff") ¶ 8 (hereby attached as Exhibit B);  and Supplemental Affidavit of David Perry ("Suppl. Perry Aff.") ¶ 3 (hereby attached as Exhibit C) (explaining that local Plaintiff distributors and contractors were not informed about the Green Ribbon Task Force, much less asked to participate).

City's purported "alternatives to compliance" can possibly work in the very common context of a homeowner needing to replace an outdated or non-performing HVAC system or water heater,[2] largely because all opportunities to "trade off" energy use in one area with energy use in another areas simply do not exist.[3]  For all practical purposes, then, should enforcement of the Ordinances not be enjoined, anyone seeking to replace a furnace that fails next winter will have to purchase and install a product that meets energy efficiency standards that are federally preempted.   As eight of the Plaintiff distributors and contractors have stated in the affidavits attached to Plaintiffs' Motion and this Reply, this will lead to lost sales and business, loss of customer goodwill, and possibly the complete loss of their businesses.

Even a cursory review of how the City Ordinances came into being suggests that the City's intent is and was to prohibit the use of HVAC and water heating equipment at the federal minimum standards and to thus circumvent preemption.  The City argues that the prescriptive portions of these Ordinances were add-ons requested by industry.  This argument is not consistent with the original text of Volume II (attached as Exhibit B to Plaintiff's Complaint), which required use of prescriptive standards with the sole caveat that if a home was LEED or Build Green NM Silver certified, it would be "deemed to have met" those requirements. This indicates that LEED Silver and Build Green NM Silver compliance were contemplated as exemptions from Volume II, not alternatives to compliance.  The first time the Ordinances included the "alternative" of achieving a 30% increase in overall energy efficiency was after Plaintiffs explained to the City that the

---

[2] John Bucholz, the City's Green Building Program Manager admits several times that the City's "performance alternatives" apply to replacements for both commercial and residential products, although the provisions of Volume II do not apply to replacements of furnaces and air conditioners before July 1, 2009.  *See* John Bucholz Aff. ¶¶ 28, 34, 36 (attached to City's Response).

[3]  If a current home has a federally-compliant 78% AFUE gas furnace, for example, Volume II's prescriptive requirements require that unit to be replaced by a more expensive (and more costly to install) 90% AFUE unit. As the mandate of a 90% AFUE furnace is clearly preempted (unless the State has received a waiver of preemption), the City says the homeowner could choose to use an "alternative to compliance."  Resp. at 4-5.  However, to replace the 78% AFUE furnace with another 78% AFUE unit would require, in Mr. Bucholz's words, "that the owner replaces or modifies other components in the building to make up for energy efficiency loss resulting from the decision not to use units that meet the prescriptive standards."  *See* Bucholz Aff. ¶ 28. Thus, a homeowner could not purchase, install and use a federally-compliant unit as a replacement unless he made some unspecified--and perhaps unaffordable, unwanted, or otherwise unnecessary--modifications to the home. The homeowner and his HVAC contractor would have no idea from reviewing the City Ordinances exactly what modifications would be necessary.

codes were preempted by federal law. Only then did the City amend the Ordinances (Volume II and the High Performance Buildings Ordinance) in a transparent attempt to disguise their unconstitutional, preempted provisions. Furthermore, the Ordinances continue to contain language <u>requiring</u> use of units with minimum efficiencies more stringent than what federal law requires.

Enforcement of the challenged provisions of the Ordinances will cause Plaintiffs irreparable harm in at least five ways: 1) *per se* irreparable harm occurs when Plaintiffs are forced to comply with potentially unconstitutional preempted ordinances and are subject to two conflicting sets of energy efficiency standards (*see* § V(A)); 2) through losses of their customer base, reputation, and customer goodwill (*see* § V(B)); 3) by being threatened with civil and criminal penalties (*see* § V(C)); 4) because economic harm from this ordinance is difficult, if not impossible, to calculate (*see* § (V)(D)); and, 5) because the City has not waived sovereign immunity, it may not be possible to recover a money judgment (*see* §V(E)).

The City's argument that it is in the public interest to allow the City Ordinances to be enforced is simply without merit. Congress has already determined the public interest:    preemptive national appliance energy efficiency standards except for statutorily-defined exceptions. It is in the public interest to maintain the status quo of uniform national standards. It is not in the public interest to have less consumer choice, to require homeowners and businesses to pay more for Albuquerque-compliant products, or to require homeowners to substantially alter their homes in order to comply with the City Ordinances.

Finally, the City has identified absolutely no interest of the City that will be harmed if the City continues to follow and enforce EPCA's standards during the pendency of this lawsuit. Balancing that lack of any harm to the City with the harm of imposing unconstitutional, preempted City Ordinances clearly favors maintenance of the status quo. It is simply impossible to undo the harms that will accrue to Plaintiffs if the City Ordinances are imposed and then ultimately determined to be preempted.

## **ARGUMENT**

**I.      THE PLAINTIFFS' CHALLENGES TO THE ORDINANCES ARE RIPE FOR JUDICIAL REVIEW.**

In its Response Brief, the City argues that the Plaintiffs' challenges to the City Ordinances are not ripe for judicial review because, specifically, Plaintiffs have not yet applied for a permit under the City Ordinances. *See* Response Brief ("Resp.") at 19. According to the City, there is no "case or controversy" ripe for adjudication as Plaintiffs cannot know, at this juncture, whether the Ordinances will adversely affect them. *See id.* In support of this proposition, the City cites to *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967). *See id.* at 20. Yet this is an unhelpful citation for the City considering that *Abbott Laboratories* is the leading case in support of pre-enforcement judicial review.

The doctrine of ripeness is an issue of timing. *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995). In *Abbott Laboratories*, the Supreme Court held that businesses may pursue pre-enforcement challenges to regulations to learn whether they must incur the costs of compliance. 387 U.S. at 153. It is now a well-established principle of law that "where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat – for example, the constitutionality of a law threatened to be enforced." *MedImmune, Inc. v. Genentech, Inc.*, 549 S.Ct. 764, 772 (2007) (emphasis in original); *see also New Mexicans for Bill Richardson*, 64 F.3d at 1501 ("one does not have to await the consummation of threatened injury to obtain preventative relief") (citing *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923)).

The two-part test for ripeness, established by the *Abbott Laboratories* court, evaluates (1) the fitness of the issues for judicial review and (2) the hardship to the parties of withholding court consideration. 387 U.S. at 149. With respect to the first factor, an issue is fit for judicial review if it is purely legal and does not depend on the occurrence of uncertain events. *Verizon Wireless, LLC v. City of Rio Rancho*, 476 F. Supp. 2d 1325, 1331 (D.N.M. 2007). Issues of statutory construction and preemption, like those raised in this lawsuit, are legal issues, and they are fit for judicial review as a matter of law. *See id.* at 1332; *Pac. Gas &*

4

*Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983).   The second factor regarding hardship considers whether the challenged City Ordinances pose a "direct and immediate dilemma" to the plaintiffs.   *Verizon*, 476 F. Supp. 2d 1325.   In pre-enforcement situations, like this one, the dilemma is the difficult decision confronting Plaintiffs between complying with the ordinances and abandoning their rights, and refusing to comply with them and risking prosecution for non-compliance.   *See MedImmune*, 549 U.S. at 773.

Furthermore, where a statute or ordinance is arguably unconstitutionally vague, like it is here, an otherwise premature controversy is considered ripe for judicial review.   *New Mexicans for Bill Richardson*, 64 F.3d at 1503.   This is because a party "challenging its constitutionality in a facial attack should not be expected to pursue their collective activities at their peril."   *Id.* (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 303 (1979)).

The City filed a Supplemental Response in Opposition to Motion for Preliminary Injunction, in which it cites two additional cases purportedly in support of its argument that the Plaintiffs' challenges are not ripe. *See* Suppl. Resp. at 1.   However, the two cases--*United States v. Friday*, 525 F.3d 938 (10th Cir. 2008) and *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150 (2006)--neither discuss nor mention the ripeness doctrine.   Therefore, the cases are wholly irrelevant and lend absolutely no support to the City's ripeness argument.

II.   **WITH A HIGH LIKELIHOOD OF SUCCESS ON THE MERITS, THE REMAINING THREE ELEMENTS NECESSARY FOR A PRELIMINARY INJUNCTION ARE WEIGHED LESS HEAVILY.**

Plaintiffs agree with the City that a preliminary injunction "is an extraordinary remedy."   Resp. at 17. Any suggestion by the City, however, that Plaintiffs are seeking an injunction of the type that, in the Tenth Circuit, is "disfavored" and requires the movant to meet a heightened burden is unfounded.   *See Dominion Video Satellite v. Echostar Satellite Corp.*, 269 F.3d 1149, 1154-55 (10th Cir. 2001) (explaining that the

heightened burden applies to preliminary injunctions that "(1) disturb the status quo, (2) are mandatory rather than prohibitory, or (3) provide the movant substantially all the relief it could feasibly attain after a full trial on the merits").   Instead, the traditional test for a preliminary injunction applies to this case.

Furthermore, because Plaintiffs can demonstrate a high probability of success on the merits, the emphasis on the remaining three factors for a preliminary injunction is lessened.  "In general, emphasis on the balance of [irreparable harm to plaintiffs and defendants] results in a sliding scale that demands less of a showing of likelihood of success on the merits when the balance of hardships weighs strongly in favor of the plaintiff, and vice versa."  *O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 1002 (10th Cir. 2004) (en banc) (Seymour, J. concurring in part, with Tacha, C.J. and Porfilio, Henry, Briscoe, and Lucero, C.J) *aff'd sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546, U.S. 418 (2006) (emphasis added) (citation and quotations omitted).  "[T]he more likely a movant is to succeed on the merits, the less the balance of irreparable harms need favor the movant's position" to qualify for a preliminary injunction.  *Id.* (internal quotation marks and alteration omitted); *see also Taylor v. Westly*, 488 F.3d 1197, 1200 (9th Cir. 2007) (reversing district court and granting preliminary injunction on the "combination of [plaintiffs'] probable success on the merits and the possibility of irreparable injury").

## III.   PLAINTIFFS WILL PREVAIL ON THE MERITS BECAUSE THE ORDINANCES IMPOSE PRESCRIPTIVE STANDARDS THAT ARE PREEMPTED BY FEDERAL LAW.

In Plaintiffs' Motion, we demonstrated a high likelihood of success on the merits because 42 U.S.C. §§ 6297(c) and 6316(b) preempt state and local regulation of the energy efficiency or energy use of, respectively, residential and covered commercial products.  The City's response does not rebut that showing.  Instead, the City focuses excessively on several "alternatives to compliance," never addressing how these purported alternatives can logically apply to replacements of HVAC products and water heaters, never explaining whether it is possible to comply with the alternatives using products at the federal

minimum efficiency levels, and never addressing the fact that there is simply no exception from preemption in 42 U.S.C. § 6316 for commercial products.

In 1987, Congress amended the Energy Policy and Conservation Act ("EPCA") to prescribe stringent new standards for the energy efficiency of major residential HVAC products and water heaters nationwide. The legislation was hailed by both manufacturers and the environmental community as a major achievement.[4]  EPCA regulates in extraordinary detail the energy efficiency and energy use of covered HVAC products and water heaters.  Through EPCA, Congress established national public policy in balancing the energy efficiency of HVAC products and water heaters with the interests of American manufacturers and consumers in competitive markets that deliver energy efficient products while achieving economies of scale.[5] Unsurprisingly for a statute with such breadth and specificity, EPCA expressly preempts state and local regulations "concerning the energy efficiency or energy use" of covered residential products, 42 U.S.C. § 6297(c), including regulations contained in state or local buildings codes, 42 U.S.C. § 6297(f)(2).   Likewise, EPCA expressly preempts state and local regulations "concerning the energy efficiency [and] energy use" of covered commercial products.  42 U.S.C. § 6316(b)(2)(A).

**A.      The City Ordinances Impose Numerous Prescriptive Product Energy  Efficiency Standards That Are Preempted by EPCA.**

The City, throughout its response papers, barely takes EPCA and its express preemption provisions into account.  The City admits that the prescriptive requirements of the Ordinances do "provide for energy efficiency standards for HVAC products in excess of the federal standards."  Resp. at 7 and 11.  In fact, as Plaintiffs' First Amended Complaint and Plaintiffs' Motion demonstrate, the City has adopted over 30 minimum efficiency standards for residential and commercial products covered by EPCA that are more

---

[4]   *See, e.g,* 133 Cong. Rec. S.1909 (Feb. 5, 1987) (statement of Senator Johnston).
[5]   *See* discussion of EPCA and NAECA legislative history at pp. 8-10 of Plaintiffs' Motion.

stringent than the corresponding federal standards. Those efficiency standards are preempted as a matter of law.[6]

The City attempts to "save" even the prescriptive portions of the Ordinances with two lines of argument. First, the City makes the incredible (and unsupported) argument that the Ordinances are not "regulations" at all and thus the "statutes do not even apply." Resp. at 16-17. As Plaintiffs explained in our Motion, a city ordinance is undeniably a "regulation" for purposes of EPCA preemption. Motion at 12. The City, however, claims that the ordinances are <u>not</u> regulations because, while they clearly "concern" energy efficiency, in EPCA's terms, they are not "mandatory." Resp. at 17. But even a quick glance at the "minimum equipment performance" standards in Table 403.2 of Volume II and the "HVAC Requirements" for small office and retail buildings in Tables 6.3.-1 and 6.3.-2 in Volume I shows that the Ordinances <u>prescribe</u> (or, in other words, mandate) certain minimum efficiency standards. We are also told that the Ordinances are not mandatory because there are "alternatives" to compliance. However, the City admits that an applicant for a building code <u>must</u> satisfy at least one of the "alternatives." *See, e.g,* Resp. at 36. No support is provided for the City's argument that a building code, which requires "compliance" under pain of civil and criminal penalties, is not a "regulation."

Accordingly, at a minimum, the "prescriptive" portions of the challenged Ordinances are preempted and the Court should enjoin their enforcement. The City argues that the "alternatives" to the prescriptive requirements should not be enjoined. However, none of these "alternatives" comply with EPCA's detailed exception from preemption for certain building codes and thus do not save the Ordinances from preemption under federal law.

---

[6] Note that the City's prescriptive standards are preempted regardless of whether they are more or less stringent than or identical to federal standards. The fact that the City standards are, in nearly all cases, more stringent, is an important factor concerning the irreparable harm Plaintiffs will suffer if the Ordinances are allowed to go into effect. *See, infra*, Section V.

**B.**   **Volume I's Requirements for Commercial Covered Products Must Be Struck  Down Because EPCA Contains No Exceptions From Preemption for "Alternatives to Compliance."**

Volume I of the City Ordinances concerns commercial buildings.  The federal statute that preempts state and local regulations of the energy efficiency of covered commercial products is 42 U.S.C. § 6316:

> A standard prescribed or established under section [42 U.S.C. § 6313(a)] shall, beginning on the effective date of such standard, supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established pursuant to such section.

The "products for which a standard is prescribed" include the following types of industrial equipment: small, large and very large commercial package air conditioning and heating equipment, air conditioners and heat pumps, furnaces and boilers, and water heaters.  *See* 42 U.S.C. § 6311(1).

As Plaintiffs explained in our Motion, there are only two exceptions from preemption for commercial products:  First, a state can seek a waiver of preemption from the Secretary of the U.S. Department of Energy ("DOE").   42 U.S.C. § 6416(b)(2)(A).   Second, a state building code may adopt the minimum efficiency requirements of the current ASHRAE standard.   The City's response completely ignores both exceptions and thus fails to explain how the challenged provisions of Volume I are saved from preemption. Instead, the City misleadingly discusses LEED certification and a "30% efficiency improvement" option as "alternatives." *See* Resp. at 7.   Since these options—or any other such alternatives to compliance—are clearly not allowed as exceptions to preemption in EPCA for commercial products, they merit no further discussion here.   The City simply cannot mandate the challenged energy efficiency standards in Volume I, and they must be found to be preempted.

**C.**   **For Residential Products, Each of the City's  "Alternatives to Compliance" Must be Scrutinized to Determine Whether it Meets Both the Spirit and the Letter of EPCA's Exception from Preemption for State or Local Building Codes.**

The City argues at length (but without attaching key relevant exhibits) that it has provided multiple "alternatives to compliance."   Resp. at 3-14.   These include buildings which have achieved "Silver" certification under the LEED system; and buildings which have achieved the "Silver" ranking of the "Build Green NM" code.  Buildings achieving such certifications are "exempt" from the Ordinances.  The City also relies on Volume II's "performance alternatives" in Sections 404 (adopted in the original) and 405 (adopted as part of the amendments to Volume II in June 2008).  An overriding problem with the City's "alternatives-save-the-Ordinances" argument is that if the prescriptive portions of the Ordinances are set aside, as they must be, it makes no sense to argue that the "alternatives" continue to operate.  If a provision of the Ordinances is expressly set forth as an "alternative" to compliance with the prescriptive standards, and the prescriptive standards fail, there remains nothing for which the "alternatives" apply to--they would be alternatives to what, exactly?  The City's efforts to devise statutorily-acceptable "alternatives to compliance" thus fail the common sense test that something cannot be chosen as an "alternative" when there is nothing from which to choose in the first place.

Moreover, the City Ordinances cannot, as a matter of law, be "saved" by simply severing the federally-preempted prescriptive provisions.   Exclusion of the invalid provisions would render the Ordinances meaningless, and, therefore, the ordinances must necessarily stand as a whole or fail together. Where the constitutionality of a state statute or city ordinance is challenged, the issue of severability is governed by state law.  *Panhandle E. Pipeline Co. v. Okla. ex rel. Comm'rs of the Land Office*, 83 F.3d 1219, 1224 (10th Cir. 1996); *see also Costco Wholesale Corp. v. Maleng*, 522 F.3d 874, 886 (9th Cir. 2008).   The High Performance Buildings Ordinance and the Albuquerque Energy Conservation Code (Volumes I and II) each contain their own severability clause.   *See* Volume I, Section 1.4 ("validity"); Volume, as amended, Section 101.6 ("validity"); and High Perf. Bldgs. Ord. Section 4.5 ("severability").  The inclusion of a severability clause, however, raises only a (rebuttable) presumption that the invalid provisions

of the ordinances should be severed.  Under New Mexico law, severability is <u>only</u> appropriate where three

factors are met:

> (1) the invalid part must be separable from the other portions without impairing the force and effect of the remaining parts; (2) the legislative purpose expressed in the valid portion can be given force and effect without the invalid part; and (3) when considering the entire act, it cannot be said that the legislature would not have passed the remaining part if it had known that the objectionable part was invalid.

*Harvey E. Yates Co. v. Powell*, 98 F.3d 1222, 1240 (10th Cir. 1996) (citing *Giant Indus. Ariz., Inc. v.*

*Taxation & Revenue Dep't*, 110 N.M. 442, 796 P.2d 1138, 1140 (Ct. App. 1990)).  Invalid provisions

absolutely cannot be severed from a statute or ordinance where there is such interdependence of all

provisions as to make it reasonably certain that, absent the invalid provisions, the legislature or city council

would not have enacted the remaining provisions as they stand.  *Clovis Nat'l Bank v. Callaway*, 69 N.M.

119, 364 P.2d 748 (1961).

Even if the "alternatives" could exist after deletion of the prescriptive standards, none of the

alternatives in Volume II passes muster under 42 U.S.C. § 6297(f)(3).  The City wholly fails to answer the

point that the building code exception in § 6297(f)(3) applies only to <u>new</u> residential construction.

Accordingly, Volume II's "alternatives" concerning restoration, repair, renovations, or alterations of

residential buildings (and replacement of products) cannot survive.  Secondly, even for new construction,

the City does not explain how it is possible to comply with the "alternatives" while using only covered

products that meet but do not exceed federal standards.  The City's "alternatives" thus fail as applied to

new construction as well.

EPCA's exception from preemption for certain building codes in Section 6297(f)(3) outlines in detail

the requirement that a building code--if it is to meet the exception from preemption--be flexible and allow

efficiency trade-offs that do not bar the use of products that meet but do not exceed the EPCA standards.

This is why EPCA requires trade-offs to be on a "one-for-one equivalent energy use or equivalent cost

basis."   42 U.S.C.  §  6297(f)(3)(C).   Trade-offs cannot unfairly weight higher-efficiency EPCA-covered products in such a way that the building code effectively requires the installation of the higher efficiency products.

Section 6297(f)(3) was intended and designed to ensure that a state or local government choosing to develop performance-based building codes could not craft options in a way that a federally-compliant product would nonetheless be effectively barred from use.  The "baseline" building or energy consumption or conservation objective in the building code must be based on the use of EPCA-covered products at federal minimum efficiency levels.  *See* 42 U.S.C. § 6297(f)(3)(D).

EPCA's exception for certain building codes demands that the code provides some means or calculus by which to weigh the various energy values of covered products and to compare their energy impacts.  *See* 42 U.S.C. § 6297(f)(3)(A), (C).  Lacking such a calculus, it is impossible to allow the one-for-one trade-offs among various building elements to satisfy an overall goal of a certain level of energy usage.  An example here would be an Albuquerque home builder who wants to use large expanses of windows in a new home.  Since greater window areas increase heating and cooling loss, the builder might want to install higher energy efficiency heating and cooling appliances as a trade-off, so that the energy loss from larger windows is compensated by energy savings from more efficient HVAC.

The careful criteria set forth in Section 6297(f)(3) are designed to ensure that a performance-based building code does not either directly or underlineeffectively require the installation of EPCA-covered products whose energy efficiencies exceed the applicable federal minimum standards.  *See, e.g.*, 133 Cong. Rec. H883 (March 3, 1987) (Statement of Sen. Wyden).  Especially because the City Ordinances are hopelessly confusing, vague, rife with incorporations by reference, and sometimes contradictory, the criteria of Section 6297(f)(3) must be read to place some obligation on the City to explain to users how they might comply by using covered products that meet minimum federal standards.  While a state or local government does not

12

have to petition DOE for review and approval of a building code that meets statutory requirements, *see* 42 U.S.C. § 6297(f)(4)(A), this does not mean that the City can implement a code that is not sufficiently intelligible for one to determine whether it satisfies the letter and spirit of the Section 6297(f)(3) exemption criteria.

Given the express preemption provision of EPCA as to residential products and the fact that Congress outlined a strict test for any acceptable building code alternatives, the City should bear the burden of explaining how it is possible to satisfy each of its proposed alternatives by using only products at the federal minimum efficiency levels.

### 1. Section 405 of Volume II Does Not Meet EPCA's Exception from Preemption for State or Local Building Codes.

Section 405 in Volume II, as amended, requires a building to be 30 % more efficient than a baseline building that meets the "standard reference design" of the 2003 IECC. Although the 2003 IECC already reflects a building deemed to be energy efficient, Section 405 does not require mere compliance with the 2003 IECC, it says the building has to be 30% <u>more</u> efficient. Furthermore, the analysis of compliance is to be confined to heating, cooling and service water heating energy only.

Section 405, as with the City's other "alternatives," does not explain, however, how a builder could reasonably comply using HVAC products and water heaters at the federal minimum efficiency levels, as required by EPCA. *See* 42 U.S.C. § 6297(f)(3)(B) ("the code does not require that the covered product have an energy efficiency standard exceeding the applicable [federal] standards"). The City argues that since Section 405 simply leaves it up to builders to select products and to determine for themselves the required one-for-one energy use tradeoffs, *see* Resp. at 29-31, it complies with Section 6297(f)(3).

However, to design a new home to be 30 % <u>better</u> than the 2003 IECC baseline in the energy consumed by heating, cooling and service water heating, while still using products at the federal minimum

levels, would be a daunting challenge. *See* Perry Suppl. Aff. ¶¶ 9-10.   Although it may be theoretically possible to adjust the building envelope or other building components to reduce a home's heating and/or cooling (but not water heating) load, there is only so much a builder can do to a home to reduce the heating/cooling load and still end up with a home that is aesthetically satisfactory and affordable enough for potential buyers.  It is quite likely that in order for a builder to have any hope of satisfying the 30% objective, he or she would have to increase the efficiency of the home's HVAC systems and the water heater beyond federal minimum standards.

Section 405 of Volume II, as amended, also provides no tools in the form of trade-off values or energy credits that enable one to determine that compliance is possible using only EPCA-covered products at the federal minimum standard levels.

2.     **Section 404 of Volume II Does Not Meet EPCA's Exception from Preemption for State or Local Building Codes.**

As explained in Plaintiffs' Motion, Section 404 of Volume II requires compliance with the minimum efficiency standards in Volume II's Table 404.5.2.1, which adopts by reference Tables 403.1 and 403.9.1. To be more precise, Section 404 adopts in its entirety Section 404 of the 2006 IECC, which outlines a "simulated performance alternative" for compliance with the IECC.  That simulated alternative refers to a "standard reference design" in Table 404.5.2(1) of the 2006 IECC.  Confusingly, however, Section 404 of Volume II replaces the IECC's "standard reference design" with the minimum efficiency requirements in Volume II's Table 404.5.2.1.   These are the same minimum efficiency requirements that Plaintiffs have already established are preempted by federal law!  Section 404's attempt to establish a baseline building (or "standard reference") design is thus based on installation of EPCA-covered products whose efficiencies exceed federal minimum standards.  This is simply not permitted by EPCA.  *See* 42 U.S.C. § 6297(f)(3)(D).

The City's defense of Section 404—which is to basically say that the standards in the "standard reference design" are not mandatory and that there are other alternatives available--is entirely inadequate. Although the City claims it would be possible to comply with Section 404 without using any of the higher efficiency products listed in Tables 403.1 and 403.9.1, Section 404 provides absolutely no guidance as to how someone would do that.   A contractor or distributor who seeks to comply with Section 404 but is baffled by its vagueness and confusion is almost certain to look only at the specific numerical (and preempted) minimum efficiency requirements in Tables 403.1 and 403.9.1.   *See* Richardson Suppl. Aff. ¶ 5. Section 404 thus fails as an acceptable building code that would meet EPCA's exception from preemption.

> 3.   **Silver LEED Certification Does Not Comply with Section 6297(f)(3) Because it Cannot Be Achieved Solely With Use of Products at the Federal Minimum Efficiency Levels.**

Silver LEED for Homes applies only to new residential construction.  Compliance with LEED Silver is impossible to achieve without use of at least one HVAC product that exceeds the federal minimum standards.  That is, by following the minimum LEED requirements for HVAC products, one would have to install products that *exceed* federal standards.  First, the LEED manual explains that certain "prerequisites are <u>mandatory</u> measures and <u>must be completed</u> during the design of construction phase."  *See* LEED for Homes Rating System at viii (relevant portions of the LEED manual hereby attached as Exhibit D).  One of the prerequisites in the "Energy & Atmosphere" category is compliance with Energy Star.  *Id*.  The "Energy and Atmosphere" section explains further that a prerequisite for HVAC equipment, in order to meet the minimum "good" level, is that it must meet the requirements of the Energy Star for Homes "Builder Option" package.  *See id.* at 66.  The minimum standards of the Builder Option package are described in Table 19 of the LEED manual.  Since Albuquerque is in IECC Zone 4B, to achieve just the "good" levels (EA 6.1 in Table 19(a)) would require use of the following covered products at levels that exceed federal standards: central AC and air source heat pumps (LEED requires 8.2 HSPF; federal minimum requires 7.7 HSPF);

15

furnaces (LEED requires 90% AFUE; federal minimum requires 78% AFUE); and boilers (LEED requires 85% AFUE; federal minimum requires 80% AFUE).

Since there is no way to comply with LEED Silver requirements without using covered products that exceed federal minimum standards, LEED Silver does not meet the requirements of Section 6297(f)(3) and is therefore not a legitimate "alternative" to compliance.[7]

> 4. **Build Green NM Silver Does Not Comply with Section 6297(f)(3) Because it Cannot Be Achieved Solely With Use of Products at the Federal Minimum Efficiency Levels.**

The City also argues that an applicant for a building code can meet the requirements of "Build Green NM Silver." Build Green NM, according to the City, is thus another "alternative" that somehow saves the entirety of the Ordinances from preemption. Unhelpfully, the City did not include the Build Green NM guidelines as an exhibit to its response. However, "Build Green New Mexico," like LEED Silver for Homes, appears to apply only to new construction of residential buildings. *See* "Build Green NM/NAHB Model Green Home Building Guidelines," (relevant portions hereby attached as Exhibit E). By definition, therefore, it cannot be used as an "alternative to compliance" in replacement situations. Build Green NM is a point-based system in which a builder can accrue qualifying points in numerous areas, including many areas that have nothing to do with the actual construction of the home, such as water efficiency of landscaping, lot design and preparation, indoor environmental quality, and homeowner education. *See id.* pp. 5-7. Points related to the energy efficiency of HVAC and water heating products can apparently be traded off for points that have no relation to energy consumption. Build Green NM also adopts requirements of IEEC 2003 as a "baseline" for new home construction, and then requires performance 30% above that baseline to meet the "Silver" rating. *See id.* p. 26. For at least these two reasons, therefore,

---

[7] Note that the City's discussion of how LEED has been adopted in other municipalities is irrelevant and misleading, as in nearly all of those other municipalities, LEED ordinances have not yet gone into effect. *See* "LEED in Albuquerque and Other Municipalities," hereby attached as Exhibit F.

Build Green NM does not comply with 42 U.S.C. § 6297(f)(3)'s requirements for a building code that would be exempt from preemption.

      **D.**      **The Ordinances' Unconstitutional Vagueness Also Requires Them to Be Struck Down.**

Except for the City's citation to *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150 (2006), which deals with a facial challenge to a city ordinance based on vagueness, the City neither mentions nor addresses in its Response Plaintiffs' arguments that the City Ordinances are unconstitutionally vague.  *See* Suppl. Resp. at 1-2.  To the extent that the City intended *Doctor John's, Inc.* to address our claims of vagueness, however, the case only lends support to Plaintiffs' arguments that compliance under the ordinances is either unworkable, incomprehensible, or both.  Like the plaintiff in *Doctor John's*, *Inc.* Plaintiffs here are challenging the City Ordinances on their face, rather than as applied.  While recognizing that "[f]acial challenges are strong medicine," Plaintiffs vigorously maintain that only the prescriptive provisions of the ordinances "provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits."  *See Doctor John's, Inc.*, 465 F.3d at 1157, 1158 (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000).  Compliance under the alternatives is impossible to discern.  *See* Richardson Suppl. Aff. ¶¶ 4-5; Salmon Aff. ¶¶ 13-14 (attached as Exhibit E to Motion); Perry Aff. ¶ 24 (attached as Exhibit F to Motion); Thompson Aff. ¶ 19 (attached as Exhibit J to Motion); Berg Aff. ¶ 17 (attached as Exhibit K to Motion).  As long as the prescriptive provisions remain in the City Ordinances, however, they are effectively preempted by the federal statutes and thus unconstitutional.

      **E.**      **The Ninth Circuit Court of Appeals' Decision in *Energy Resources* Does Not Help the City in Arguing that EPCA Does Not Have Preemptive Effect in This Case.**

In its Response, the City misrepresents *Air Conditioning and Refrigeration Institute e. al, v. Energy Resources Conservation and Development Comm'n*, 410 F.3d 492 (9th Cir. 2005) ("*Energy Resources*") as the "seminal case on preemption of EPCA and NAECA." *See* City's  Response at 18.  In fact, the two-to-

17

one Ninth Circuit decision did not concern preemption of state regulation of appliance energy efficiency or energy use and has no applicability here whatsoever.  *Energy Resources* instead concerns whether California could impose certain information disclosure requirements on appliance manufacturers.  *Energy Resources* is unlike this case, in which the City has blatantly attempted to impose minimum energy efficiency standards that are different than the federal minimum standards, and thus runs afoul of EPCA's express preemption.  *Energy Resources* involves a completely different subsection of EPCA than the one at issue here, relies on entirely distinguishable express preemption language, never discusses the prospect of alleged "alternatives" to preempted laws, and should have no bearing on this Court's ultimate analysis.

In *Energy Resources*, the Ninth Circuit panel carved out a narrow ruling specifically based on 42 U.S.C. § 6297(a)(1) and 42 USC § 6316(a), (b).  Because the court did not believe that Congress intended EPCA to preempt state regulations requiring manufacturers to submit data to state agencies, the Court held that the California regulations were not preempted.  Subsection 6297(c), which is the EPCA preemption provision applicable to the Albuquerque Ordinances, is never mentioned in the court's discussion.[8]  *Energy Resources* is thus completely unhelpful to this Court's analysis.

## V.   PLAINTIFFS HAVE NO ADEQUATE REMEDY AT LAW AND WILL BE IRREPARABLY HARMED IF FORCED TO COMPLY WITH PREEMPTED ORDINANCES.

An injunction is an equitable remedy that invokes the sound discretion of the district court.  *See Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980).  In this case, Plaintiffs have shown that they will almost certainly suffer irreparable harm unless a preliminary injunction is granted.  *See Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987).  Plaintiffs have made a deliberate and detailed showing that they will suffer irreparable harm if this Court does not enjoin enforcement of the City

---

[8] Of significance to this case, the court in *Energy Resources* did note that § 6297 was passed by Congress to allow for "broader preemption standards" in order to confront "a growing patchwork of differing State regulations which would increasingly complicate [manufacturers'] design, production and marketing plans." *See* 410 F.3d at 500 (citing S. Rep. No. 100-6); *see also* Plaintiffs' Brief at 12.

Ordinances.[9]

Plaintiffs' unrefuted affidavits are much more than "wild speculation."  *See* Response at 21. Plaintiffs' affidavits are firmly based on experience in Albuquerque's HVAC market and serve as an important barometer to measure various irreparable harms.  These harms will certainly occur should the Court not enjoin enforcement of the challenged provisions of the City Ordinances.  To this end, Plaintiffs articulate five different, individually sufficient, ways in which they have been and will be irreparably harmed.

**A.      Plaintiffs Will *Per Se* Be Irreparably Harmed if Forced to Comply With Preempted Ordinances.**

As indicated above, a party suffers irreparable harm when it is subjected to laws that are preempted.  In *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773 (5th Cir.)(1990), *cert. denied*, 498 U.S. 926, several states attempted to regulate advertisements of airline fares, which the court held was likely preempted because these advertisements were already comprehensively regulated by federal law.[10]  The court held that the likelihood of success on the preemption question <u>necessarily</u> established irreparable harm.

The same principles of irreparable harm apply here.  Enforcement of the City Ordinances will cause irreparable harm because Plaintiffs will be deprived of the federally-created right to have only one regulator when it comes to energy performance and efficiency standards rather than be subject to part of a "patchwork" of local ordinances that are preempted by federal law.  Thus, enforcement of the City's Ordinances, in the face of express preemption language found in §6297(c), will cause the Plaintiffs *per se* irreparable harm.  *See* Donahue Aff. ¶ 10 (attached as Exh. G to Motion); Salmon Aff. at ¶ 12.

**B.      Plaintiffs Will Suffer Irreparable Harm By Loss Of Their Customer Base, Reputation And Customer Goodwill.**

---

[9] *See* collectively, affidavits of local plaintiffs attached both to this Reply and Plaintiffs' original motion.
[10] The Fifth Circuit's preemption holding was subsequently upheld (after the district court entered a permanent injunction in the case) by *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992).

The Tenth Circuit takes a common sense approach to evaluating irreparable harm within the business context:

> Courts have routinely recognized the irreparable hardship that a business experiences when its relationships with customers are threatened.   When the failure to grant preliminary injunctive relief creates the possibility of death, mayhem, breach of the peace, permanent loss of customers or the loss of goodwill, the irreparable injury prong is satisfied.

See *Tri-State Generation & Transmission Ass'n., Inc. v. Shoshone*, 805 F.2d 351, 356 (10th Cir. 1986); *see also Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551-552 (4th Cir. 1994).  In addition to customer relationships, the Third Circuit has augmented this standard, finding that "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will." *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998).

Plaintiffs have meticulously demonstrated the types of reputational harm, loss of customer goodwill, loss of trade and permanent loss of customers that will occur in the absence of injunctive relief. *See* Donahue Aff. ¶ 12; Richardson Suppl. Aff. ¶ 13, Perry Suppl. Aff. ¶¶ 5-7; Howland Aff. ¶¶ 14-16. The City's incomplete and misleading comparison to what has happened in other cities--especially as to LEED-based ordinances--does not refute this showing, especially where the ordinances in those cities are substantively different (and most are not yet even in effect).  *See* Description of LEED Ordinances in Albuquerque and Other Municipalities at Exhibit F.

Plaintiffs have met their burden of showing irreparable harm, particularly because of loss of goodwill.  For example, an entire type of HVAC product–outdoor roof-top units--will become completely unavailable to Plaintiffs' customers since roof-top units that meet Albuquerque standards simply do not exist.  *See, e.g.,*  Richardson Aff. ¶ 19; Perry Suppl. Aff. ¶ 4.  As another example, one Plaintiff asserts that his customers "look to [him] as an expert" in the area of HVAC compliance.  *See* Richardson Suppl. Aff. ¶ 5; *see* Perry Aff. ¶ 24 ("Code inspectors rely on, and often telephone, distributors like Perry Supply to

decipher codes and answer questions about heating and cooling systems").   Mr. Perry explains that since the Ordinances' complex and contradictory wording make them nearly incomprehensible, he fears losing customer goodwill since he will be unable to assist his customers.   Perry Aff. ¶ 4.   Mr. Richardson is also reasonably certain that he will lose customer goodwill and reputational standing.   Richardson Suppl. Aff. ¶ 5.   In past experience with similar changes in efficiency standards, Mr. Richardson saw a direct effect on his customer base, with a permanent loss of customers when the 2006 federal minimum standard for air conditioners was raised.   *Id.* ¶ 6.   His statements are therefore not "unfounded supposition[s]" as mischaracterized by the City.   *See* Resp. at 21.

      **C.**      **Plaintiffs Are Irreparably Harmed Because They Are Threatened with Both Civil And Criminal Sanctions.**

The Tenth Circuit has long recognized that the dual threat of civil and criminal sanctions can constitute irreparable harm.   In *Mesa Petroleum Co. v. Cities Service Co.*, 715 F.2d 1425, 1432 (10th Cir. 1983), the court expressly held that the plaintiffs "were subject to prosecution under that allegedly unconstitutional Act.   It was this threat of punishment that, implicitly, made out the irreparable injury requirement…" Thus, when the City Ordinances are enforced, the documented threat of civil and criminal penalties is sufficient to constitute irreparable harm.   *Id.; see also FiberMark N. Am., Inc. v. Jackson*, 2007 U.S. Dist. LEXIS 22206, at **30-31 (D.N.J. Mar. 28, 2007) ("[c]learly, exposure of FiberMark to civil and criminal sanctions . . . would constitute irreparable harm").

      **D.**      **Plaintiffs Will Be Irreparably Harmed Because Their Economic Harm is Extremely Difficult or Impossible to Accurately Ascertain.**

Irreparable harm is derived when a monetary remedy following a full trial on the merits would be "inadequate or difficult to ascertain."   *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156, (10th Cir. 2001) (citing *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001)).   Here, Plaintiffs cannot accurately ascertain exactly how extensive their losses will be if the City begins to enforce

the Ordinances because their permanent losses, including economic losses, additional training expenses, and customer losses, cannot be tallied up on a ledger sheet. *See* Howland Aff. ¶ 9 (stating that enforcement of the City codes will likely force Affordable Service out of business). For example, one of the Plaintiffs has stated that his distribution business will be forced to move locations if the Ordinances are enforced. *See* Berg Aff. ¶ 12. Relocating one's business is more than an economic endeavor, as the business will forfeit goodwill earned in the old location and a host of unascertainable costs involved in relocation. Another Plaintiff notes that he will be forced to compete in an environment where uncertainty and arbitrariness will harm contractors who endeavor to follow the rules. *See* Salmon Aff. ¶ 16. In concise terms, there is no formula that the Court could devise that would adequately recompense Plaintiffs.

   E.    **Plaintiffs Are Irreparably Harmed Because, Even If They Prevail In This Action, It May Be Impossible To Obtain Damages From The City Due to Sovereign Immunity.**

This case is somewhat unique, as it is unclear whether the City will claim that monetary compensation cannot be awarded to Plaintiffs due to its status as a sovereign under the state law doctrine of sovereign immunity. *See* NMSA 1978, § 41-4-4(A)(2008).[11] Although irreparable harm is not present when the plaintiff has a claim for money damages, an exception to the general rule exists when it is shown that a money judgment will go unsatisfied absent equitable relief. *See Hoxworth v. Blinder Robinson & Co. Inc.*, 903 F.2d 186, 205 (3d Cir. 1990) (the possibility of an unsatisfied money judgment can, as a matter of law, constitute irreparable injury for purposes of granting a preliminary injunction).

Since the City as a governmental entity has not affirmatively waived sovereign immunity and in fact has raised qualified immunity as a defense, any after-the-fact monetary judgment may not be recoverable. Accordingly, the threat of unrecoverable economic loss qualifies as irreparable harm. *See Baker Elec.*

---

[11] The Act grants immunity to government entities and public employees acting within the scope of their duties from any tort liability, except as explicitly waived. The waiver provisions of the Tort Claims Act are set forth in §§ 41-4-5 through 41-4-12 and do not apply to the instant case.

*Coop., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994) ("[w]hen a plaintiff sues a state official alleging a violation of federal law, the federal court may . . . not . . . award retroactive monetary relief" and "[w]hen an action is essentially against the state to recover money, the state is the real party in interest and is entitled to invoke sovereign immunity . . .") (internal citations omitted).

The Tenth Circuit has previously recognized that an uncollectable damage judgment may support a claim for irreparable injury in a preliminary injunction action.  *See Tri-State* 805 F.2d at 354; *see also Trans World Airlines, Inc. v. Mattox* 773, 784 (5th Cir., 1990), *cert. denied*, 498 U.S. 926; *see also Bioganic Safety Brands, Inc. v. Ament*, 174 F. Supp. 2d 1168, 1178-79 (D. Colo. 2001) ("the injury to [plaintiff], by its inherent nature, is irreparable because damages would be inadequate and difficult to ascertain, and, in any event, probably would be precluded by an immunity defense").

## VI.   THERE IS NO PUBLIC INTEREST IN THE ENFORCEMENT OF LAWS THAT ARE LIKELY TO BE FOUND UNCONSTITUTIONAL.

The City asserts that it is not in the public interest to postpone enforcement of the challenged provisions of the Ordinances.  Putting aside for the moment the fact that the City itself has repeatedly delayed enforcement, it should be underscored here that the injunction Plaintiffs seek will prevent enforcement of regulations that are very likely preempted by federal law.  "The public interest element of an application for preliminary injunction is <u>satisfied</u> when the injunction seeks to enforce express federal preemption from state encroachment <u>because Congress has already found that exclusive federal regulation in such matters is in the public interest</u>."  *Bioganic Safety Brands,* 174 F. Supp. at 179 (emphasis added).  It is also well established that the public interest is not served by enforcing a preempted or potentially unconstitutional law.  *See, e.g, Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001); *Planned Parenthood Fed'n of Am. v. Bowen*, 680 F. Supp. 1465, 1478 (D. Colo. 1998) ("delaying the enforcement of unconstitutional regulations is not adverse to the public interest, but rather promotes the

public interest.").

As explained both here and in Plaintiffs' Motion, Plaintiffs have shown a substantial likelihood that the challenged provisions of the City Ordinances are preempted by federal law, and thus are void under the Supremacy Clause of the United States Constitution. There is simply no public interest to be found in enforcement of laws or regulations that are likely to be found unconstitutional.

## VII.   THE BALANCE OF HARMS CLEARLY FAVORS PLAINTIFFS SINCE THERE IS NO INJURY TO THE CITY FOR THE COURT TO WEIGH.

The City will not be harmed by delaying enforcement of the ordinances pending this Court's decision whether the challenged provisions of the ordinances are preempted. "In the context of an application for a preliminary injunction to enforce federal preemption, where a state purports to regulate an area preempted by Congress, there is no injury to the state to weigh." *Bioganic Safety Brands,* 174 F. Supp. 2d at 1179; *see also Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir.,1990), *cert. denied*, 498 U.S. 926 ("Since Congress expressly preempted this area of regulation, the states are not injured by the injunction."); *Bank One, Utah v. Guttau,* 190 F.3d 844, 848 (8th Cir. 1999) (if a state statute is preempted by federal law and plaintiffs will be harmed by enforcement of that statute, plaintiffs are "entitled to injunctive relief no matter what the harm to the State").

Moreover, federal law and regular DOE rulemaking already provide for the energy efficiency of covered products. As already described, the intent of the 1987 amendments to EPCA by NAECA was to increase energy efficiency of covered products while providing for stringent federal preemption. The harm that the City may incur from having to wait for a final determination of the constitutionality of its Ordinances does not outweigh the harm to the Plaintiffs from having to comply with preempted, and thus unconstitutional, regulations.

24

Respectfully submitted,

MODRALL, SPERLING, ROEHL,
  HARRIS & SISK, P.A.

*Electronically Filed*

By_____Leslie M. Padilla, Attorney at Law_____
John R. Cooney
Douglas A. Baker
Leslie M. Padilla
Attorneys for Plaintiffs
P.O. Box 2168
Albuquerque, NM 87103
(505) 848-1800


WE HEREBY CERTIFY that on the 18th day of September, 2008, we filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

John E. DuBois, Esq., Attorney for Defendant City of Albuquerque (jdubois@cabq.gov)
Bruce Klaw, Esq., Attorney for Defendant City of Albuquerque (bwklaw@stoel.com)
Adam Richins, Esq., Attorney for Defendant City of Albuquerque (ajrichins@stoel.com)
Jeremy Sacks, Esq., Attorney for Defendant City of Albuquerque (jdsacks@stoel.com)
Thomas Snyder, Esq., Attorney for Defendant City of Albuquerque (twsnyder@stoel.com)

MODRALL SPERLING ROEHL
  HARRIS & SISK, P.A.


By_____/s/ Leslie M. Padilla_____
Leslie M. Padilla, Attorney for Plaintiffs

K:\DOX\CLIENT\83365\0001\W0878743.DOCX.doc