IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

THE AIR CONDITIONING, HEATING AND
REFRIGERATION INSTITUTE et al.,

   Plaintiffs,

v.                No. CIV-08-633 MV/RLP

CITY OF ALBUQUERQUE,

   Defendant.

**DEFENDANT'S POST-HEARING BRIEF**

  The October 1, 2008 preliminary injunction hearing made clear that all of Plaintiffs' various complaints and challenges to the Code boil down to one question: May Plaintiffs halt the green building movement in Albuquerque and, by extension, in cities throughout the United States simply because the City has enacted a Code which permits builders and owners to choose to use HVAC and water heating equipment in excess of federal minimum standards when choosing among various performance-based building code standards, including LEED certification? The answer is no.

  If Plaintiffs are successful in enjoining the City's Code, Albuquerque will be the first city in the country to lose the ability to implement LEED or similar green building programs. This result would be ironic, given that the City of Albuquerque only identifies LEED as one of several options for compliance. If Plaintiffs can enjoin a building code that allows a builder or owner to choose between LEED certification or other paths, then surely other codes that simply require LEED certification cannot survive. And that is the ultimate intent of Plaintiffs' motion.

Plaintiffs' witness David Lewis candidly admitted that Plaintiffs view any ordinance mandating compliance with LEED or similar standards to violate federal law.[1]

At the same time, Mr. Lewis acknowledged neither LEED nor the other Code options generally are dependent on attaining any particular HVAC or water heating efficiency standard – a point upon which City witnesses John Bucholz and Stace McGee agreed.  So in other words, Plaintiffs challenge LEED and other options as unlawfully prescribing energy efficiency standards relating to HVAC equipment, while at the same time acknowledging that they require no particular type of HVAC equipment at all.

This fallacy highlights the problem with Plaintiffs' entire case.  Plaintiffs take the square pegs of the various performance-based compliance options (including but not limited to LEED certification) and try to ram them through the round hole of the preemption exception found in NAECA, 42 U.S.C. 4297(f)(3).  That does not work.  As the 9th Circuit already has recognized, the preemptive reach of NAECA (42 U.S.C. § 6297) and EPCA (42 U.S.C. § 6316) is narrow. Ordinances do not trigger NAECA or EPCA preemption where they are "indirect, remote, and tenuous." *Air Conditioning and Refrigeration Institute et al. v. Energy Resources Conservation and Development Comm'n*, 410 F.3d 492, 502 (9th Cir. 2005), *cert. denied*, 547 U.S. 1205, 126 S.Ct. 2887 (2006) ("*Energy Resources*").  Here, as Plaintiffs acknowledge, LEED and the other green building options enacted by the City do not directly impact HVAC and water heating efficiencies.

The Code therefore is not preempted by these federal laws.  Indeed, it is virtually impossible for Plaintiffs to meet their burden of showing otherwise, absent a complete record.  In

---

[1] As noted in the City's response brief, LEED certification is required for privately-owned construction projects in several major cities, including but not limited to, Boston, Los Angeles,
(...continued)

mounting their premature facial attack on the Code, Plaintiffs must show that the Code "is impermissible in all, or at least the 'vast majority[,] of its intended applications." *U.S. v. Friday*, 525 F.3d 938, 952 (10th Cir. 2008) (quoting *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 n. 5 (2006)). While the City has shown the numerous ways in which the Code can be lawfully applied and satisfied, including many ways that would be affordable, Plaintiffs have failed to show that they even attempted to comply with the Code by applying for a permit. The parade of horribles advanced by Plaintiffs in their affidavits was exposed at the hearing for what it was – purely hypothetical. Speculative harms and unreasonably contorted hypothetical interpretations of the Code cannot support an injunction.

**I.      Plaintiffs Have Not Shown A Likelihood of Success On the Merits**

   **A.      The Code Lawfully Applies to New Construction**

In the context of new construction, both Code Volumes I (commercial) and II (residential) provide for the performance-based options of LEED Silver certification.[2] As Messrs. Lewis, Bucholz, and McGee all confirmed, *LEED Silver certification is not dependent on the use of any particular HVAC or water heater efficiency level.*[3] Messrs. Bucholz and McGee confirmed that LEED Silver can be attained simply by using the federal minimum standards.

---

(...continued)
San Francisco, Baltimore, Palo Alto, Albany, and Annapolis.
[2]   Bucholz Aff. (PI Hearing Ex. 1): Ex. A, § 2.4(b) and Ex. C, § 103.2.
[3]   The City notes that this is contrary to Plaintiffs' earlier statement in its reply brief that LEED Silver contained a prescriptive requirement, which the City revealed as erroneous in its supplemental response brief. Plaintiffs' witness Lewis confirmed that the prescriptive requirements were only one of two options for LEED certification.

Both Volumes I and II also provide for a compliance path based on showing that the building's total energy efficiency exceeds a baseline design by 30% or more.[4] Messrs. Lewis and Bucholz confirmed that *the 30% energy improvement level is not dependent on any particular the use of any particular HVAC or water heater efficiency level*. Mr. Bucholz confirmed that the 30% increase can be attained simply by using the federal minimum standards. Significantly, Messrs. Lewis and Bucholz confirmed that the baseline design did not incorporate HVAC and water heating standards that were in excess of the federal minimum standards.[5]

Volume II provides for two additional performance-based compliance paths. A builder may choose certification under Build Green New Mexico (or "Build Green NM"), which is a state-sponsored green building plan.[6] As Messrs. Lewis and Bucholz confirmed, *Build Green NM certification is not dependent on the use of any particular HVAC or water heater efficiency level*.[7] Mr. Bucholz confirmed that Build Green NM can be attained simply by using the federal minimum standards.

Under Volume II, a builder also may elect under Section 404 to achieve compliance through measuring the total energy efficiency against another baseline, which is known as the

---

[4] Bucholz Aff. (PI Hearing Ex. 1): Ex. A, §§ 4.2.1.1; 6.2; 6.5; 7.2; 7.5 and Ex. C, § 405.
[5] Even though Plaintiff's witness Lewis already had confirmed that the baseline design in Section 405 of Volume II did not exceed federal standards, Plaintiffs' counsel spent considerable time with Mr. Bucholz on cross-examination trying to get Mr. Bucholz to testify to the contrary. Mr. Bucholz confirmed Mr. Lewis' view that the baseline did not exceed federal limits.
[6] Bucholz Aff. (PI Hearing Ex. 1): Ex. C, § 103.2.
[7] Mr. Lewis seemed to raise the issue that the interaction between Build Green NM and the Code was circular because Build Green NM requires compliance with local building energy codes, and he seemed to surmise that this meant that a builder would need to meet the prescriptive requirements in Volume II. That is not the case. Mr. Bucholz confirmed that Section 103.2 of Volume II clearly excluded Build Green NM from compliance with the prescriptive tables. Bucholz Aff. (PI Hearing Ex. 1): Ex. C, § 103.2.

"Component Performance Option."[8] In this case, the baseline does incorporate standards that are in excess of the federal minimum. Mr. Bucholz confirmed, however, that the builder would not need to exceed the total energy efficiency of the baseline, as s/he would need to do in the 30% excess exemptions. Instead, the builder only would need to meet these standards, whether by using the higher efficiency products *or by making other adjustments* to the building that, together, would bring its overall efficiency up to the baseline design.

In sum, in commercial construction, a builder has two alternatives outside of using higher efficiency HVAC and water heating products. In residential construction, a builder has *four* such options.

### 1.     *NAECA and EPCA Are Not Triggered*

Despite these performance-based alternatives, Plaintiffs claim that NAECA and EPCA are triggered because the remaining option for compliance with the Code – included at the request of industry representatives – is to use prescribed products that exceed the federal minimum standards (although the City notes that this prescriptive standard is generally only available in the commercial context for small buildings (below 20,000 square feet).[9]

NAECA and EPCA simply do not apply to preempt the Code. The testimony at hearing was overwhelming that the alternative compliance paths do not, as a legal or practical matter, require use of HVAC or water heating products in excess of the federal minimum standards. Mr. McGee testified that he has worked on many such projects for LEED certification. Plaintiffs offered no opposition testimony, aside from pointing to selected examples where they claim that LEED certification was expensive. The City contests that LEED certification necessarily is

---

[8] Bucholz Aff. (PI Hearing Ex. 1): Ex. C, § 404.

expensive, particularly when viewed in relation to overall construction costs. In any event, Plaintiffs clearly have not met their burden in showing that LEED certification is not an option in "virtually all circumstances." *Friday*, 525 F.3d at 952. More significantly, Plaintiffs did not present any evidence demonstrating that the other compliance paths (e.g., 30% energy efficiency increase, Build Green NM, and the Component Performance Option) were not viable alternatives to new construction in "virtually all circumstances."

Other portions of EPCA confirm that the City's performance-based codes operate outside of EPCA and NAECA. In addition to setting federal minimum standards for commercial HVAC and water heating products, EPCA set up a federally-funded program to assist states in encouraging, among other things, green building. When enacting EPCA, the federal government clearly contemplated that the states would play an important role in energy conservation. As set forth in 42 U.S.C. § 6321, Congress found that "the development and implementation by States of laws, policies, programs and procedures" to conserve energy and to improve energy efficiency will have an "immediate and substantial effect" in curtailing energy demand and minimizing the adverse effects of increased energy consumption. Congress also found that State energy conservation plans will "most efficiently and effectively" account for local conditions, and minimize the adverse economic and employment consequences of changing patterns of energy consumption. 42 U.S.C. § 6321(a)(3). State plans eligible for federal funds must include "a goal, consisting of an improvement of 25 percent or more in the efficiency of use of energy in the State consumed in calendar year 2012 as compared to calendar year 1990, and may contain interim goals." 42 U.S.C. § 6324. Stat plans also specifically may include "programs for

---

(...continued)
[9] Bucholz Aff. (PI Hearing Ex. 1): Ex. A, §§ 4.2.1.1; 6.2; 6.5; 7.2; 7.5

encouraging and for carrying out energy audits with respect to buildings and industrial facilities within the State," 42 U.S.C. § 6322(d)(6), "programs to promote energy efficiency in residential housing" 42 U.S.C. § 6322(d)(8), "programs to promote energy efficiency as an integral component of economic development planning conducted by State, local or other governmental entities ...," 42 U.S.C. § 6322(d)(11), "programs for the development of building retrofit standards and regulations, including retrofit ordinances enforced at the time of the sale of a building" 42 U.S.C. § 6322(d)(14), and "any other appropriate method or programs to conserve and to promote efficiency in the use of energy," 42 U.S.C. § 6322(17).

With respect to "programs to promote energy efficiency in residential housing," EPCA clearly indicates that the state may include in its plan programs "such as ... " (A) programs for development and promotion of energy efficiency rating systems for newly constructed housing and existing housing so that consumers can compare the energy efficiency of different housing; and (B) programs for the adoption of incentives for builders, utilities, and mortgage lenders to build, service or finance energy efficient housing." 42 U.S.C. § 6322(d).  Indeed, Congress recognized that "State agencies" have "primary responsibilities for the protection of consumers....or practices affecting commerce which relate to the implementation of measures likely to conserve, or improve efficiency in the use of energy, including energy conservation measures and renewable resource energy measures." 42 U.S.C. § 6325(d).

The City has decided not to seek federal funding for assistance in implementing a conservation plan. Nevertheless, these portions of EPCA make clear that, despite Plaintiffs claims that EPCA and NAECA essentially preempt the field of green building energy efficiency standards, nothing could be further from the truth.

### 2. *Alternatively, Volume II Meets The NAECA Exemptions*

The City maintains that EPCA and NAECA do not apply to the Code. But even if they did, the performance-based alternatives set forth in Volume II meet the exceptions for residential new construction set forth in 42 U.S.C. 6297(f)(3) ("Section 6297(f)(3)").

With the assistance of Plaintiffs' counsel, Mr. Lewis walked through each of the performance-based options in relation to Section 6297(f)(3). For the first three options (LEED, Build Green NM, and Section 404), Mr. Lewis observed that these options generally allowed energy trade-off between building components having, according to him, nothing to do with energy efficiencies. As noted above, it is for these very reasons that the City submits that this statute is not triggered.

But regardless, in relation to the fourth option - Section 405 - Mr. Lewis confirmed that this option generally met the terms of Section 6297(f)(3) with two exceptions. First, Mr. Lewis testified that Section 405 adopted as its baseline the standards set forth in IECC 2003. Mr. Lewis agreed that these standards were not "in excess" of federal standards, consistent with Section 6297(f)(3)(D). However, he complained that the IECC standard for air conditioners was in IECC 2003 was 10 SEER, which is *below* the federal standard of 13 SEER. He further complained that IECC 2003 did not contain a standard for service water heating. Obviously, this is immaterial. Federal law already requires minimum usage of these products. The mere fact that the IECC 2003 contains outdated standards does not impact the overall exception. Indeed, Mr. Lewis admitted that the newer IECC 2006 manual contained the correct federal minimum standards. As Mr. Bucholz confirmed, it is these standards that would be incorporated into the baseline.

The only other issue Mr. Lewis had with Section 405 is that it banned the use of electric-resistant water heating as a primary heat source. However, as the City has explained in prior

briefing, federal law does not prohibit cities from banning certain equipment. Nothing in NAECA prohibits this. And it is not as if the City banned a lower energy efficient product in favor of a higher energy efficient, which clearly would be a ruse for circumventing preemption. The City has banned the product altogether, at any efficiency level.

### B.     The Code Lawfully Applies to Replacements

Much of the October 1, 2008 hearing focused on replacements and, in particular, Plaintiffs' claims that the performance-based options were impractical when replacing HVAC or water heaters.

Plaintiffs failed to appreciate, however, two important exceptions. First, Mr. Bucholz confirmed that both Volumes I and II will except replacements where replacement with a higher efficiency unit would result in extensive revisions to other systems, equipment, or elements of a building.[10] Second, Mr. Bucholz confirmed that under both Volumes I and II, building owners may choose none of these options and replace the unit with a unit of the same energy efficiency *provided* that the owner replaces or modifies other components in the building to make up for energy efficiency loss resulting from the decision not to use units that meet the prescriptive standards.[11]

Plaintiffs' counsel framed this second option as requiring an owner to spend additional money in order for the privilege of installing a product meeting minimum federal standards. But that is not at all the requirement. As Mr. Bucholz testified, the purpose of the Code is not to penalize owners for using federally-compliant products; rather it is to lift the overall energy

---

[10] Bucholz Aff. (PI Hearing Ex. 1): Ex. A, §§ 4.2.1.3 and 6.1.1.3(b) and Ex. C, § 403.2.
[11] Bucholz Aff. (PI Hearing Ex. 1): Ex. A, § 4.2.1.3(c) and Ex. C, § 107.3.

efficiency of the building. Energy efficiency improvement action is only triggered when constructing a new building or addition or when replacing a product. The Code is not punitive or retroactive. It provides incentives to improve the overall energy efficiency of the home, not any one product. In this regard, it is entirely consistent with the Congressional goals expressed in connection with the EPCA section on state energy conservation plans, discussed above.

### C.     Plaintiffs' Other Challenges Are Irrelevant and Immaterial

Plaintiffs at hearing also challenged certain language in the Code provisions, essentially taking issue for the first time as to whether some of the language supported the City's positions. Underscoring the prematurity of Plaintiff's attacks, Plaintiffs challenges were generally difficult to follow and cannot entirely be responded to here in the abstract. The City believes that the Code provisions are entirely consistent with its positions and submits that this just underscores why implementation of the Code is required in order for Plaintiffs to mount any type of challenge. Nevertheless, what Plaintiffs lost sight of as they poured over prior iterations of the Code and selected portions of text, is that the City has clarified virtually every question presented and example proffered, and it will continue to do so. Plaintiffs' attempts to undermine the Code by relying on prior iterations and superseded language speaks more to the lack of merit in their overall case than it reveals any shortcomings in the Code itself.

### D.     The Code Is Severable

In the event that the Court found Plaintiffs likely to succeed on a challenge to any portion or application of the Code, any injunction should be narrowly tailored to such portion or application because the Code properly contains severability language. Section 1.4 of Volume I reads " If any term, part, provision, section, paragraph, subdivision, table, chart, or referenced standard of this code shall be held unconstitutional, invalid, or ineffective, in whole or in part,

such determination shall not be deemed to invalidate any remaining term, part, provision, section, paragraph, subdivision, table, chart, or referenced standard of this code."[12] Section 101.6 of Volume II reads "If a portion of this code is held to be illegal or void, such a decision shall not affect the validity of the remainder of this code."[13] These standards virtually conclusively establish the Council's intent to allow at least some portions of its Code to become effective. *See, e.g., Leavitt v. Jane L.*, 518 U.S. 137 (1996) (noting that the touchtone of severability is whether the "the legislature would have enacted the remaining valid provisions without the void ones," and overturning decision invalidating the entirety of a Utah law abortion law merely because lawful provisions referenced the enjoined unlawful provisions); *Harvey E. Yates Co. v. Powell*, 98 F.3d 1222 (10th Cir. 1996) (overturning injunction and remanding for determination whether legislature would have passed valid portions separate from invalid).

## II.  Plaintiff's Have Failed to Show Irreparable Injury

Perhaps what was most evident from the October 1 hearing was that Plaintiffs will not be irreparably injured if the Code is not enjoined. Plaintiffs' witnesses Richardson, Perry, and Salmon confirmed that they already stock and market high efficiency products. The Plaintiff GAMA association reports that 37% of all furnaces purchased in 2007 were high efficient furnaces.[14] Plaintiff wholesalers Richardson and Perry (who as wholesalers are not even covered by the building Code) complained of inventory challenges, yet they admitted that they face inventory challenges today and always have. This is "just one more thing" as Mr. Richardson confirmed. Mr. Perry confirmed that, after efficiency standards were raised on air conditioners,

---

[12] Bucholz Aff. (PI Hearing Ex. 1): Ex. A, § 1.4.
[13] Bucholz Aff. (PI Hearing Ex. 1): Ex. C, § 101.6.
[14] Bucholz Supp. Aff. (PI Hearing Ex. 2): Ex. I.

his initial drop in sales was met with an increase after the lower efficient products were eliminated from the market. He acknowledged that he has higher profit margins on higher efficiency products. Finally, although a representative was not presented as a witness, Plaintiff Johnstone Supply proclaims on its website:

> Energy-efficiency is the name of the game in today's business environment. Increase your sales and profitability by recommending and installing energy savings parts and equipment from Johnstone Supply. You'll help save the environment and create customer loyalty.[15]

In addition to negating any notion of irreparable harm, Plaintiffs' witnesses confirmed that there issues with the Code was based more on their misunderstandings than on any of its substantive provisions. Mr. Perry stated he was confused by portions of the Code, but had "been out of town" during several key meetings of the Green Ribbon Task Force and he admitted he had not bothered to bring any of his confusions to the Green Building Manager, Mr. Bucholz. Similarly, as a contractor, Mr. Salmon stated that his only real issues with the Code were that the determination as to whether replacements would effect "extensive revisions to other systems, equipment, or elements of a building..." would be made by a City official, without benefit of an appeal. Mr. Bucholz confirmed, however, that these decisions in fact were appealable. Also, Mr. Bucholz confirmed that standards concerning extensive revisions would likely be developed as the Code was implemented. That is not unusual for any Code and hardly makes it unconstitutionally vague. *See e.g., Hill v. Colorado*, 530 U.S. 703 (2000) (rejecting plaintiffs "hypertechnical theories" as to what the statute covered and adding that "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'")

---

[15] See http://www.johnstonesupply.com/corp/Default.aspx (last visited Sept. 12, 2008).

III.  **Balancing of Harms and Public Interest Disfavors an Injunction**

While trying to avoid a Code that (in their view) requires them to sell products that they already are selling, Plaintiffs have never attempted to address the harm of a preliminary injunction on the City or the public.

In the Report of Working Group I of the Intergovernmental Panel on Climate Change ("IPCC"), the IPCC made the following conclusions in its "Summary for Policymakers:"[16] carbon dioxide is the most important of the greenhouse gases (p. 2); the atmospheric concentration of carbon dioxide in 2005 exceeds by far the natural range over the last 650,000 years (*Id.*); the annual carbon dioxide concentration growth rate was larger from 1995-2005 than it has been since the beginning of measurements in 1960 (*Id.*); the primary source of the increased atmospheric concentration of carbon dioxide results from fossil fuel use (*Id.*); as a result of this increase, there is a 90% chance that global average net effect of human activities has caused warming (*Id.* at p. 3); warming of the Earth is unequivocal, as is evident from observations of increases in global average air and ocean temperatures, widespread melting of snow and ice, and rising global sea level (*Id.* at p. 5). The IPCC concluded that continued greenhouse gas emissions at or above current rates would cause further warming and induce many changes in the global climate system during the 21st Century that would very likely be larger than those observed during the 20th Century. (*Id.* at p. 13). This included the virtual certainty of warmer days and nights over most land areas, the very likelihood of frequent heat waves and heavy precipitation events, and the likelihood of drought, increased tropical cyclones, and higher sea levels. (*Id.* at p. 8).

Implementation of the Code obviously will not by itself remedy global warming.

However, in the more recent report of IPCC Working Group III, the "Summary of Policymakers" section[17] notes that carbon emission mitigation actions have started to work and can continue to work to reduce carbon emissions and combat global warming. The IPCC notes that the largest growth in greenhouse gases has come from the energy supply sector and that the buildings sector has a very high level of electricity use. (*Id.* at p. 3). The IPCC further notes that there is a substantial potential for the mitigation of global greenhouse emissions. (*Id.* at p. 9). Specifically, the IPCC notes that "energy efficiency options for new and existing buildings could considerably reduce $CO_2$ emissions with net economic benefit." (*Id.* at p. 13).

Delay of implementation of the City's Code for the year that this case may take to be decided is not simply an issue of an additional year of emissions at current levels. Rather, by delaying implementation, there is a good chance that the City may forever lose the ability to control emissions resulting from newly-built inefficient buildings over the life of the building. That means that one year of delay could result in 20 years or more of excess emissions for any given building. Further, implementation of the City's Code hopefully will continue to encourage communities to enact similar codes aimed at reducing carbon emissions, thus collectively increasing the impact. On the other hand, suspension of the Code, even for the life of this lawsuit, very well could have a chilling effect and work against the recommendation of the IPCC.

---

(...continued)
[16] See IPCC website at http://www.ipcc.ch/press/index.htm (last visited Sept. 12, 2008).
[17] See IPCC website at http://www.ipcc.ch/press/index.htm (last visited Sept. 12, 2008).

IV.  **Conclusion**

For the foregoing reasons, the Plaintiffs' motion should be denied.

STOEL RIVES LLP

By: /s/
Thomas W. Snyder
Stoel Rives LLP
999 18th Street, Suite 2700
Denver, CO 80202
(303) 297-7884
twsnyder@stoel.com

Adam J. Richins
101 S. Capitol Blvd., Suite 1900
Boise, ID 83702
(208) 389-9000
ajrichins@stoel.com

Jeremy D. Sacks
Bruce W. Klaw
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
(503) 224-3380
jdsacks@stoel.com
bwklaw@stoel.com

CITY OF ALBUQUERQUE
Robert M. White, City Attorney

John E. DuBois
Assistant City Attorney
Post Office Box 2248
Albuquerque, New Mexico 87103
(505) 768-4500
jdubois@cabq.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 2, 2008, I filed the foregoing **DEFENDANT'S POST-HEARING BRIEF** electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected in the Notice of Electronic Filing:

John R. Cooney – *jrcooney@modrall.com*

Leslie M. Padilla – lpadilla@modrall.com

Douglas Baker – dbaker@modrall.com

Attorneys for Plaintiffs

STOEL RIVES LLP

By: /s/
Thomas W. Snyder
Stoel Rives LLP
999 18th Street, Suite 2700
Denver, CO 80202
(303) 297-7884
twsnyder@stoel.com

Adam J. Richins
101 S. Capitol Blvd., Suite 1900
Boise, ID 83702
(208) 389-9000
ajrichins@stoel.com

Jeremy D. Sacks
Bruce W. Klaw
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
(503) 224-3380
jdsacks@stoel.com
bwklaw@stoel.com

CITY OF ALBUQUERQUE
Robert M. White, City Attorney

John E. DuBois
Assistant City Attorney
Post Office Box 2248
Albuquerque, New Mexico 87103
(505) 768-4500
jdubois@cabq.gov