IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

THE AIR CONDITIONING, HEATING
AND REFRIGERATION INSTITUTE, *et al*.,

        Plaintiffs,

                                    Civ. No. 08-633 MV/RLP

vs.

CITY OF ALBUQUERQUE,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiffs' Motion for Preliminary

Injunction, filed August 29, 2008, **[Doc. No. 30]**.  The Court, having considered the briefs,

relevant law, the evidence presented at the hearing held on October 1, 2008, and being otherwise

fully informed, finds that Plaintiffs' motion is well-taken and will be **GRANTED**.

## BACKGROUND

Plaintiffs, local and regional distributors of heating, ventilation, air conditioning, and

water heating products and three national trade associations that represent the manufacturers,

contractors, and distributors of these products, assert that certain portions of three City of

Albuquerque ordinances that impose minimum energy efficiency standards for commercial and

residential buildings are preempted by the Energy Policy and Conservation Act ("EPCA"), 42

U.S.C. 6201, *et seq*., as amended by the National Appliance Energy Conservation Act

("NAECA"), Pub. L. No. 100-102 (1987), and the Energy Policy Act of 1992 ("EPACT"), 42

U.S.C. §§ 6311-17.  In the instant motion, Plaintiffs seek a preliminary injunction prohibiting the

City of Albuquerque from enforcing the challenged sections of the regulations until this case is resolved.

I.    **Energy Policy and Conservation Act and the Energy Policy Act of 1992**

The EPCA was designed, in part, to reduce the United States' "domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs." S.Rep. No. 94-516, at 117 (1975), reprinted in 1975 U.S.C.C.A.N. 1956, 1957.  Part of EPCA's energy conservation program was to "authorize energy efficiency standards for major appliances." *Id*. at 118, reprinted in 1975 U.S.C.C.A.N. at 1959.  The EPCA, as amended by the NAECA and the EPACT, establishes nationwide standards for the energy efficiency and energy use of major residential and commercial appliances and equipment, including heating, ventilating, and air conditioning ("HVAC") products and water heaters.  Principal responsibility for maintaining, and, if necessary, amending these standards was given to the U.S. Department of Energy ("DOE").

The EPCA, as amended, contains a preemption provision that prohibits state regulation "concerning" the energy efficiency, energy use, or water use of any covered product with limited exceptions. 42 U.S.C. § 6297(c).  A "state regulation" is defined as any "law, regulation, or other requirement of a State and its political subdivisions."  42 U.S.C. § 6297(a)(2)(A).  EPCA provides a number of exceptions from federal preemption.  *Id.* at § 6297(f)   The only exception relevant to this case applies when the regulation is in a building code for new construction and certain conditions are met.  42 U.S.C. § 6297(f)(3).

EPACT expanded the EPCA's federal appliance program to include energy efficiency standards for commercial and industrial appliances. 42 U.S.C. §§ 6295(j)-(k), 6313.  EPACT

incorporated the preemption provisions of 42 U.S.C. § 6297, with a few distinctions that are not

relevant to this case. 42 U.S.C. § 6316(a)-(b).  EPACT, however, only provides one exemption

from preemption.

## II.    City of Albuquerque's Energy Conservation Code

In 2007, the Mayor of Albuquerque formed the Green Ribbon Task Force to develop and

implement changes to the City's building regulations to significantly reduce carbon dioxide and

green house gas emissions while providing industry with the flexibility to use innovative designs

and techniques to achieve the effective use of energy.  The Green Ribbon Task Force was

composed of builders, developers, architects, unions and various companies, organizations and

individuals.   After months of consideration, the Green Ribbon Task Force proposed a

combination of performance-based and prescriptive options to achieve increased energy

efficiency in the building industry.  The City's Green Building Manager then drafted Volumes I

and II of the Albuquerque Energy Conservation Code ("Code") based on the options developed

by the Green Ribbon Task Force.   At the time the Code was drafted, the Green Building

Manager, by his own admission, was unaware of federal statutes governing the energy efficiency

of HVAC products and water heaters and the City attorneys who reviewed the Code did not raise

the preemption issue.  The Code was approved by the City Council and became effective on

October 1, 2008.

### A.  Volume I of the Albuquerque Energy Conservation Code

Volume I of the Code applies to commercial and multi-family residential buildings.

Volume I adopts and incorporates by reference the American Society of Heating, Refrigeration,

and Air Conditioning ("ASHRAE") Standard 90.1-2004, with a few amendments.  Volume I

3

applies to new buildings, additions to existing buildings, and alterations of existing buildings.  It does not apply to repairs, provided that there is no increase in the annual energy consumption of the equipment following the repair.  Volume I also addresses the replacement of HVAC equipment in existing buildings.  In single unit replacements, building owners who replace an existing HVAC unit with a unit that meets federal energy efficiency requirements must replace or modify other components in the building to make up for the energy efficiency loss resulting from the decision not to use a higher efficiency unit.

Consistent with the Green Ribbon Task Force's recommendations, Volume I provides two performance-based paths to compliance--LEED certification at the silver level and 30% efficiency improvement--as well as a prescriptive option.

The LEED rating system was devised by the United States Green Building Council.  In the context of new construction and major renovations, LEED evaluates buildings in six areas: sustainable sites, water efficiency, energy and atmosphere, materials and resources, indoor environmental quality, and innovation and design process.  LEED provides four progressive levels of certification:  certified (26-32 points), silver (33-38) points), gold (39-51 points) and platinum (52-69 points).  The Code requires LEED certification at the silver level for buildings covered by Volume I.

In addition to LEED, the Code provides a second performance-based option.  Under this second option, industry can choose to make proposed commercial and residential designs 30% more energy efficient than a "baseline building" set forth in ASHRAE 90.1.  The baseline building design set forth in ASHRAE 90.1 utilizes HVAC and water heating products that do not exceed the federal efficiency levels for these products.

As a third option, the Code sets forth prescriptive standards for individual components of a building, including HVAC and water heaters.  Many, if not all, of these prescriptive standards exceed the federal standards.  The prescriptive option is limited to small retail and office buildings.

**B.  Volume II of the Albuquerque Energy Conservation Code**

Volume II of the Code applies to one and two family detached dwellings and townhouses.  Volume II applies to new construction, additions, alterations and renovations.  It does not apply to repairs; the replacement of furnaces and air conditioners before July 1, 2009; and the replacement of an existing furnace where such replacement would require "extensive revisions" to other systems or elements of a building.

Volume II adopts and incorporates by reference the 2006 International Energy Conservation Code ("IECC").  Volume II contains the same two performance-based options as Volume I--LEED silver certification and 30% energy reduction option (referred to as Section 405)--as well as two additional performance-based options.  The third performance-based option is compliance with Build Green New Mexico.  The fourth performance-based option, referred to as Section 404, is an option relative to a standard reference design.  Section 404 requires the use of HVAC and water heating products with energy efficiencies in excess of federal standards for those products.  In order to take advantage of any of the performance-based options, the owners must comply with certain mandatory requirements such as caulking and sealing around doors, adequately supporting the joints in the ductwork, and other construction quality issues.

In addition to the four performance-based options, Volume II also contains a prescriptive option.  The prescriptive option provides for energy efficiency standards for HVAC and water

5

heating products in excess of federal standards.[1]

### C.     The High Performance Building Ordinance

In 2007, the Albuquerque City Council adopted the Albuquerque High Performance Buildings Ordinance ("Ordinance"), which applies to new buildings and existing buildings undergoing alteration when the work area of the alteration exceeds 50% of the building area. The Ordinance sets several prescriptive standards for energy efficiency that are in excess of federal standards. In addition, the Ordinance requires the Green Building Manager to "establish alternative performance-based criteria for overall building energy conservation which may be used for compliance in lieu of standards prescribed therein." *See* Ordinance at § 3(A)(2). Mr. Bucholz, the current Green Building Manager, interprets this provision as requiring compliance with Volumes I and II of the Code.

## LEGAL ANALYSIS

### I.     Ripeness

As an initial matter, Defendant asserts that Plaintiffs' claims are not ripe because the Code has not yet gone into effect, much less been applied to Plaintiffs. The ripeness doctrine prevents "courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and ... protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967). The ripeness inquiry involves examining both "the fitness of the issues for judicial decision and

---

[1] The prescriptive standards are consistent with the most recent ASHRAE standards, which will become the federal standards on January 1, 2010.

the hardship to the parties of withholding court consideration." *Id*. at 149.

Plaintiffs are making a challenge to the facial validity of the Code and Ordinance, which are predominantly legal questions.  When a question is "predominantly legal," there is generally no need to await further factual development.  *Pacific Gas and Electric Co. v. State Energy Resources Conservation and Dev. Comm'n*, 461 U.S. 190, 201 (1983); *see also California Coastal Comm'n v. Granite Rock Co*., 480 U.S. 572  (1987) (no ripeness problem noted in suit seeking declaration that federal law preempted a state agency from imposing any environmental standards in a mining permit, even though plaintiff had not secured a permit); *National Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005) ("a purely legal claim in the context of a facial challenge ... is 'presumptively reviewable.' ")(quoting *National Mining Ass'n v. Fowler*, 324 F.3d 752, 757 (D.C. Cir. 2003)); *City of Auburn v. Qwest Corp*., 260 F.3d 1160, 1172 (9th Cir. 2001) (question whether states are preempted by federal law from promulgating any regulations regarding free air time for candidates did not raise ripeness issues because preemption is a question of law).  Because the issues raised in this case are predominantly legal,  Plaintiffs' facial challenge is ripe for review.

## II.    PRELIMINARY INJUNCTION

The main purpose of a preliminary injunction is simply to preserve the *status quo* pending the outcome of the case. *Penn v. San Juan Hospital, Inc*., 528 F.2d 1181, 1185 (10th Cir. 1975). In issuing a preliminary injunction, a court is attempting to preserve the power to render a meaningful decision on the merits. *Compact Van Equipment Co. v. Leggett & Platt, Inc*., 566 F.2d 952, 954 (5th Cir. 1978).

In determining whether, in the interests of effective justice, a preliminary injunction

should issue, the Court must consider four factors: (1) whether the moving party will suffer irreparable injury unless the injunction issues; (2) whether the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; (3) whether the injunction is adverse to the public interest; and (4) whether there is a substantial likelihood that the moving party will eventually prevail on the merits.[2] *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980); *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001).

## A.    Irreparable Injury

In federal court, the moving party must show irreparable injury in order to obtain a preliminary injunction. *Sampson v. Murray*, 415 U.S. 61, 88 (1974). "A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video*, 269 F.3d at 1156. Injury is generally not irreparable if compensatory relief would be adequate. *Enterprise International, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472-73 (5th Cir. 1985).

Plaintiffs assert five categories of irreparable injuries that they will suffer if enforcement of the Code and Ordinance is not enjoined: 1) being forced to comply with federally preempted regulations is *per se* irreparable harm; 2) Plaintiffs will lose customer base, reputation, and

---

[2] If a preliminary injunction alters the *status quo*, a plaintiff must show that on balance, the four preliminary injunction factors weigh heavily and compellingly in its favor. *See SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1099 (10th Cir.1991). Altering the *status quo* requires a court to grant mandatory relief under which the non-moving party must take affirmative action, whereas prohibitory injunctive relief simply preserves the *status quo*. *See id.* In this case, Plaintiffs are seeking to preserve the *status quo* and therefore are not subject to the heightened burden imposed when a plaintiff seeks to alter the *status quo*.

customer goodwill; 3) Plaintiffs will be exposed to the threat of criminal and civil sanctions; 4) Plaintiffs' economic harm is difficult, if not impossible, to quantify; 5) it may be impossible to collect any damages due to sovereign immunity.

The Court shares Defendant's view that much of Plaintiffs' alleged harm is speculative and/or unsupported. Plaintiffs, however, have provided evidence establishing that they will suffer economic harm if they are forced to comply with the regulations, including having to increase warehouse space to carry additional stock and larger stock, being unable to supply certain equipment, and being unable to decipher the Code in a way that allows them to meaningfully assist customers in selecting equipment that will comply with the Code.

This harm, while only economic, is irreparable because even if Plaintiffs prevail, it may be impossible to obtain damages from the City due to sovereign immunity. The New Mexico Tort Claims Act grants immunity to government entities and public employees acting within the scope of their duties from any tort liability, except as explicitly waived. *See* NMSA 1978, § 41-4-4(A). A city is a "governmental entity" within the context of the Tort Claims Act. *See Cole v. City of Las Cruces*, 1983, 99 N.M. 302 (1983). None of the Tort Claims Act's waiver provisions appears to apply to this case. *Id.* at §§ 41-4-5 to 41-4-12. Where a plaintiff cannot recover damages from the defendant due to the defendant's sovereign immunity, any economic loss suffered by a plaintiff is irreparable *per se*. *See, e.g., Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. and Rehab. Servs*., 31 F.3d 1536, 1543 (10th Cir. 1994) ("Because the Eleventh Amendment bars a legal remedy in damages, and the [district] court concluded no adequate state administrative remedy existed ... plaintiff's injury was irreparable"); *United States v. State of New York*, 708 F.2d 92, 93-94 (2d Cir. 1983) (finding irreparable injury where plaintiff was

unable to recover damages in federal court due to the defendant's invocation of the protections of the Eleventh Amendment).[3]

### B.     Balance of Hardships

Defendant argues that the balance of hardships favors it because a delay in implementing the regulations will result in the City losing the ability to control emissions from inefficient buildings built during that delay over the entire life of the buildings.  Plaintiffs, on the other hand, cite to the hardships imposed on them by being required to attempt to comply with regulations that are vague, complex, and preempted by federal law.  The balance of hardships favors Plaintiffs because the proposed injunction will maintain the *status quo* of not requiring products that exceed the requirements of federal law.  Plaintiffs' harm in being forced to comply with complex and arguably preempted regulations is greater than the harm to Defendant from a minimal delay in implementing the regulations, particularly when Defendant has already voluntarily delayed implementation for over a year.

### C.     Public Interest

A plaintiff seeking a preliminary injunction must demonstrate that issuance of the preliminary injunction is not adverse to the public interest. *City of Chanute v. Kansas Gas & Electric Co.*, 754 F.2d 310, 312 (10th Cir. 1985).  Defendant argues that an injunction is against the public interest because it would continue the practice of forcing the public to internalize the costs of Plaintiffs' current environmentally-damaging business practices.  Weighing against Defendant's argument, however, is the fact that Congress has determined in the EPCA (and its

---

[3]  In addition, the Supreme Court has left open the question of whether "irreparable injury" may be established by a "facially conclusive" claim of preemption.  *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366 (1989).

various amendments) that the public interest favors uniform national requirements for certain appliances.  The Court finds that Congress's determination of the public interest controls in this situation and supports the requested injunction.

### D.    Success on the Merits

The fourth prerequisite for obtaining a preliminary injunction is a showing of a likelihood of success on the merits. In *Otero Savings & Loan Association v. Federal Reserve Bank*, 665 F.2d 275 (10th Cir.1981), the Tenth Circuit adopted the Second Circuit's liberal definition of the "probability of success" requirement. When the other three requirements for a preliminary injunction are satisfied, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."  *Id*. at 278 (quoting *Continental Oil Co. v. Frontier Refining Co*., 338 F.2d 780, 782 (10th Cir.  1964)).

Preemption can occur in one of three ways: express preemption by statute, occupation of the field, or conflict between state and federal regulation.  *English v. General Elec. Co*., 496 U.S. 72, 78-79 (1990).  This case presents a question of express preemption.  An express preemption analysis turns on the interpretation of the statutory provision that allegedly preempts state law. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484-85 (1996)("The purpose of Congress is the ultimate touchstone in every preemption case." ) (internal quotations marks omitted); *Cipollone v. Liggett Group, Inc*., 505 U.S. 504, 530, n.27 (1992) (any understanding of the scope of a preemption statute must rest primarily on "a fair understanding of congressional purpose"). Consequently, the Court begins with the text of the provision in question and then moves on to the structure and purpose of the act in which it occurs.  *See New York State Conference of Blue*

*Cross & Blue Shield Plans v. Travelers Ins. Co*., 514 U.S. 645, 655 (1995).

Section 6297 contains a "general rule of preemption," which states that, subject to certain specified exceptions, when a federal energy conservation standard is established for a covered product, "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product."  42 U.S.C. § 6297(c).  The use of the word "concerning" suggests that Congress intended the preemption provision to be expansive.

"Concerning" is defined as "relating to."  Black's Law Dictionary 289 (6th ed. 1990). The Supreme Court has repeatedly emphasized that the words "relating to" express a broad pre-emptive purpose.  In the context of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1144(a), which preempts all state laws "insofar as they ... relate to any employee benefit plan," the Supreme Court has stated that the "breadth of [that provision's] pre-emptive reach is apparent from [its] language," *Shaw*, 463 U.S., at 96; that it has a "broad scope," *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 739 (1985), and an "expansive sweep," *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47, (1987); that it is "broadly worded," *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990), "deliberately expansive," *Pilot Life*, 481 U.S., at 46; and "conspicuous for its breadth," *Holliday*, 498 U.S., at 58. Accordingly, the Supreme Court has held that a state law "relates to" an employee benefit plan, and is pre-empted by ERISA, "if it has a connection with, or reference to, such a plan." *Shaw*, 463 U.S. at 97.

The legislative history makes it clear that the purpose behind § 6297's broad preemption provision was to eliminate the systems of separate state appliance standards that had emerged as

a result of the DOE's "general policy of granting petitions from States requesting waivers from

preemption," that caused appliance manufacturers to be confronted with "a growing patchwork

of differing State regulations which would increasingly complicate their design, production and

marketing plans." S. Rep. No. 100-6, at 4.  Congress intended that § 6297 would "preempt[]

State law under most circumstances."  H. R. Rep. 100-11 at 19.   There is no doubt that Congress

intended to preempt state regulation of the energy efficiency of certain building appliances in

order to have uniform, express, national energy efficiency standards.

The legislative history of NAECA provides insight on Congress's purpose in including

the "building code" exception for residential products at § 6297(f)(3).[4]  The House Report states

that the building code exception was intended to "prevent[] State building codes from being used

as a means of setting mandatory State appliance standards in excess of the Federal Standards."

H. R. Rep. 100-11 at 26.  The building code exception was intended to give states flexibility, but

this flexibility was "limited" to "ensure that performance-based codes cannot expressly *or*

*effectively* require the installation of covered products whose efficiencies exceed . . . the

---

[4] Defendant, citing to 42 U.S.C. § 6322, argues that performance-based codes operate
outside of EPCA.  Section 6322 encourages states to develop and implement state energy
conservation plans and provides federal funding to develop such plans.  These plans are to be
designed to reach certain energy goals by implementing such measures as encouraging
carpooling, allowing right turns on red lights, and regulating lighting in public buildings.  As an
option, the plans could contain programs to promote energy efficiency in residential housing,
such as "(A) programs for development and promotion of energy efficiency rating systems for
newly constructed housing and existing housing so that consumers can compare the energy
efficiency of different housing; and (B) programs for the adoption of incentives for builders,
utilities, and mortgage lenders to build, service, or finance energy efficient housing."  42 U.S.C.
§ 6322(d)(7).  Nothing in this section authorizes a state to implement a building code that
mandates energy efficiencies in residential housing construction that require, implicitly or
explicitly, covered products in excess of federal energy standards, and nothing in this section
removes residential building codes from EPCA coverage.

applicable Federal standard . . ." H.R. Rep. 100-11 at 26 (emphasis added). It was Congress's intent that a qualifying building code "follow a one-for-one equivalency as closely as possible, to assure that the credits for exceeding Federal standards are even-handed and are not unfairly weighted resulting in undue pressure on builders to install covered products exceeding Federal standards." S. Rep. 100-6 at 11.

The Court must now consider whether the City's Code and Ordinance are "regulation[s] concerning the energy efficiency, energy use, or water use" of a covered product and, if so, if the Code and Ordinance qualify for an exemption from the preemption provision.

### 1.    The Code is a regulation concerning the energy efficiency, energy use, or water use of covered products.

Defendant first argues that Plaintiffs are unlikely to succeed on the merits because the prescriptive standards within the Code are optional avenues for compliance, not mandatory requirements, and the EPCA preemption provision only applies to mandatory requirements. Defendant's argument fails for two independent reasons. First, Defendant construes Plaintiffs' challenge too narrowly. Plaintiffs are challenging whether the entire Code, including both performance-based and prescriptive options, violates the EPCA by requiring, either implicitly or explicitly, the installation of appliances with energy efficiencies greater than federal standards. There is no question that the Code is a regulation subject to the EPCA preemption provision. Second, the Court can find no support for the novel proposition that the inclusion of one or more alternatives for compliance in a regulation keeps each of the alternatives from being considered a regulation.

There is no question that the prescriptive alternatives, which explicitly require covered products in excess of federal standards, are regulations that "concern" the energy efficiency of

14

covered products.  The performance-based alternatives, while not as obvious, are also

regulations that, directly or indirectly, concern the energy efficiency, energy use, or water use of

covered products.  The City admits that the performance-based alternatives, while not explicitly

requiring a homeowner to install products that exceed federal energy standards, do require a

homeowner to incur additional expense (and the testimony suggests that this expense can be

substantial) if the homeowner chooses to install products that meet, but do not exceed, federal

energy standards.  This requirement is most stark in the provisions addressing replacement of

products.  If a homeowner chooses to replace an existing furnace with a federally-compliant

furnace, that homeowner must make other revisions to the home to make up the energy

differential between a federally-compliant furnace and a furnace that meets the requirements of

the Code.  The fact that the Code imposes additional expenses if federally-compliant products

are used strongly suggests  that the Code "concerns" the energy efficiency of covered products.

Consequently, the Code, and each of the alternatives within the Code, are preempted by EPCA

and EPACT unless they qualify for a preemption exception.

### 2.    Is the Code excepted from preemption under EPCA and EPACT?

Aside from obtaining a waiver from preemption, the only alternative to preemption

provided by EPACT for commercial products is when a state or local building code adopts

standards for commercial covered products at the minimum efficiency levels of the current

ASHRAE Standard 90.1.  *See* 42 U.S.C. 6316(b)(2)(B)(ii).  Volume I is based on ASHRAE

standards that do not become effective until 2010 and cannot be imposed now without a waiver.

Consequently, Volume I is not excepted from preemption.

The EPCA provides an exemption from preemption for residential building codes that

meet certain requirements.  Section 6297(f)(3) provides that "a regulation or other requirement contained in a State or local building code *for new construction* concerning the energy efficiency or energy use of such covered product is not superseded by this part if the code complies with [seven specified requirements]."[5] (emphasis added).  Volume II of the Code applies to replacement of covered products as well as new construction and renovations.  As replacement of a covered product and at least some renovations cannot fairly be considered new construction, they are not excepted from EPCA's preemption provision.  Consequently, the Court will confine its analysis to whether Volume II, as applied to new construction only, qualifies for an exemption from preemption.

### a.  § 6297(f)(3)(A)

The first requirement is that the "code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective."[6]  § 6297(f)(3)(A).  Plaintiffs assert that the Code does not satisfy this

---

[6]  § 6297(f)(3) provides that:

Effective on the effective date of an energy conservation standard for a covered product established in or prescribed under section 6295 of this title, a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of such covered product is not superseded by this part if the code complies with all of the following requirements:

(A) The code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.

(B) The code does not require that the covered product have an energy efficiency exceeding the applicable energy conservation standard established in or prescribed under section 6295 of this title, except that the required efficiency may exceed such standard up to the level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under

16

requirement because it does not provide a method for selecting items to meet an energy

objective.  There is no requirement, however, that the building code provide a list of items from

which a builder may select options; it simply requires that the building code allow a builder to

select various items whose combined energy efficiencies meet the objective.  All the

_____

subsection (d) of this section.

(C) The credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding such energy conservation standard established in or prescribed under section 6295 of this title or the efficiency level required in a State regulation referred to in subparagraph (B) is on a one-for-one equivalent energy use or equivalent cost basis.

(D) If the code uses one or more baseline building designs against which all submitted building designs are to be evaluated and such baseline building designs contain a covered product subject to an energy conservation standard established in or prescribed under section 6295 of this title, the baseline building designs are based on the efficiency level for such covered product which meets but does not exceed such standard or the efficiency level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d) of this section.

(E) If the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds either standard or level referred to in subparagraph (D), there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard.

(F) The energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).

(G) The estimated energy use of any covered product permitted or required in the code, or used in calculating the objective, is determined using the applicable test procedures prescribed under section 6293 of this title, except that the State may permit the estimated energy use calculation to be adjusted to reflect the conditions of the areas where the code is being applied if such adjustment is based on the use of the applicable test procedures prescribed under section 6293 of this title or other technically accurate documented procedure.

performance-based options arguably satisfy this requirement.

### b.  § 6297(f)(3)(B)

The second requirement is that the building code does not require that any covered

product have an energy efficiency exceeding the applicable federal energy conservation

standard.  Clearly the prescriptive option does not meet this requirement.  Section 404 also fails

this requirement because it explicitly requires the use of appliances that exceed federal energy

standards.  Defendant contends that this requirement is met for the remaining performance-based

standards--LEED silver, Build Green New Mexico, and Section 405--because they do not require

the use of any product, let alone a product with a specific energy efficiency.

Plaintiffs have provided evidence that these performance-based alternatives, as a

practical matter, cannot be met with products that meet, but do not exceed, the federal energy

conservation standards.[7]  Furthermore, it is undisputed that if products at the federal efficiency

standard are used, a building owner must make other modifications to the home to increase its

energy efficiency in order to comply with the Code.  Thus, in effect, there is a penalty imposed

for selecting products that meet, but do not exceed, federal energy standards.  A building code

that effectively requires the installation of products that exceed federal energy standards cannot

satisfy this provision.  *See, e.g.*, H.R. Rep. 100-11 at 26 (building code exception intended to

---

[7]  Defendant provided testimony from Stace McGee that it was possible to build or renovate a home to the LEED silver standard without using HVAC and water heating systems that exceed the federal energy standards.  Mr. McGee's testimony, however, is undermined by the fact that to date not a single home in New Mexico has been certified as LEED silver. Furthermore, Mr. McGee's testimony did not establish that it was practical to build a home to LEED silver standards using only federally compliant HVAC and water heating products.  To the contrary, Mr. McGee testified that he met LEED standards in his own home using federally compliant products by replacing the roof, installing additional insulation, and making other modifications.

"ensure that performance-based codes cannot expressly *or effectively* require the installation of covered products whose efficiencies exceed . . . the applicable Federal standard . . .") (emphasis added).

### c.  § 6297(f)(3)(C)

The third requirement is that the code provide a one-for-one equivalent energy use for installing covered products having energy efficiencies exceeding federal energy conservation standards.  Defendant asserts that the performance-based plans provide one-for-one credit for covered products that contain equivalent energy efficiencies but do not point to anywhere in the Code or its underlying documents where this is stated.  Plaintiffs have provided testimony that Build Green New Mexico and LEED silver do not state an energy consumption goal, and, consequently, there is no way to do a one-for-one equivalent energy use calculation.

### d.  § 6297(f)(3)(D)

The fourth requirement is that if the code uses one or more baseline building designs against which all submitted building designs are to be evaluated, such baseline building designs must be based on products that meet but do not exceed the federal energy efficiency standards. Defendant argues that this requirement does not apply because the Code includes two options for compliance that do not include baseline designs, therefore, it does not compare *all* building designs to a baseline building.  The Court is unpersuaded by Defendant's interpretation. The fact that there are alternative paths to compliance that do not utilize a baseline design does not exempt a baseline building design alternative from the requirement that it be based on products meeting federal efficiency standards.   The Court believes that the intent of this requirement was to ensure that baseline building designs, even if they are one of several options in a building

code, be based on products that meet but do not exceed federal energy efficiency standards in order to ensure that building codes do not require efficiency levels for covered products above federal standards.

Section 404 and Section 405 both utilize baseline building designs. The baseline building design in Section 404 is based on products that exceed the federal energy efficiency standards, making it ineligible for § 6297(f)(3)'s exception from preemption. Section 405 incorporates a baseline building design set forth in IECC 2003. While the IECC 2003 baseline building design utilizes HVAC and water heating products that do not exceed the federal efficiency levels for these products, Section 405 requires a 30% improvement over this design. Consequently, the effective baseline building design for purposes of Section 405 is a building that is 30% more efficient than a building utilizing only products at the federal efficiency levels. It is unclear where this 30% increase in efficiency will require products in excess of federal standards. As a result, the Court cannot determine if Section 405 satisfies the requirement that the baseline building design be based on products that meet but do not exceed the federal energy efficiency standards.

### e.   § 6297(f)(3)(E)

Subsection E applies if the code sets forth one or more optional combinations of items that meet the energy consumption or conservation objective. The parties agree that Volume II does not set forth one or more optional combinations of items and that this requirement does not apply.

### f. § 6297(f)(3)(F)

The sixth requirement is that the code must state energy consumption or conservation in terms of estimated total consumption of energy.  Plaintiffs assert that the Code does not specify how energy consumption is to be measured.   Defendant asserts that the Code complies with this requirement for Section 405 and Section 404 because they are based on the IECC, which specifies energy in terms of annual energy consumption.  Defendant has not refuted Plaintiffs' evidence that LEED silver and Build Green New Mexico options do not state energy consumption or conservation in terms of estimated total consumption of energy.

### g. § 6297(f)(3)(G)

The final requirement is that the code's testing procedures comply with the applicable test procedures prescribed under § 6293.  The Code does not address testing procedures but Chapter 6 of the 2006 IECC, which is incorporated into the Code, explicitly adopts the relevant testing procedures established in § 6293.

Based on the limited evidence before the Court, it appears that every performance-based option in Volume II of the Code fails to meet at least one of the seven requirements for an exemption from preemption.

Plaintiffs are likely to prevail on their challenge to the portions of the Code that explicitly require the use of appliances with standards in excess of federal efficiency standards. These portions include, at a minimum, the prescriptive options in Volume I and Volume II, Section 404 of Volume II,  and the provisions in both volumes that address the replacement of HVAC and water heaters.  Plaintiffs are also likely to prevail on their challenge to the portions of the Code that address renovations and replacements because § 6297(f)(3) only provides an

exemption for building codes for new construction. While it is less clear that Plaintiffs will prevail on their challenge to the performance-based options, Plaintiffs, at a minimum, have raised questions that are "serious, substantial, difficult and doubtful."

### 3.    Does the High Performance Buildings Ordinance comply with § 6297(f)(3)?

Defendant argues that because the Ordinance does not extend any further than the Code, it satisfies § 6297(f)(3) to the same extent that Volume II does for purposes of new residential construction. The Ordinance sets several prescriptive standards for energy efficiency that are in excess of federal standards and are preempted for the same reasons the prescriptive standards in the Code are preempted. In addition, the Ordinance requires the Green Building Manager to "establish alternative performance-based criteria for overall building energy conservation which may be used for compliance in lieu of standards prescribed therein." *See* Ordinance at § 3(A)(2). The Green Building Manager has informally adopted the Code as his alternative performance-based criteria. Consequently, for the same reasons stated above, Plaintiffs are likely to prevail on their challenge to the Ordinance as well.

While the issues are complex and the information before the Court is limited, the Court finds that Plaintiffs have satisfied their burden of demonstrating that (1) Plaintiffs will suffer irreparable injury unless the injunction issues; (2) the threatened injury to Plaintiffs outweighs whatever damage the proposed injunction may cause Defendant; (3) the injunction is not adverse to the public interest; and (4) there is a substantial likelihood that Plaintiffs will eventually prevail on it challenge that the Code and the Ordinance are preempted by federal law and invalid in the vast majority of their intended applications. Because the Court concludes that an injunction is warranted on federal preemption grounds, the Court does not reach Plaintiffs'

additional grounds for the injunction.

Volume 1 and Volume II of the Code contain severability clauses. Pursuant to these clauses, Defendant requests that any injunction be narrowly tailored to the portions of the Code upon which the Court finds Plaintiffs are likely to prevail in their challenge. As the Court has found that Plaintiffs are likely to succeed on their challenge to each compliance alternative provided by the Code, it is not clear that there are any provisions of the Code that survive the injunction. However, if there are portions of the Code that are not implicated by the claims in this case, the parties are encouraged to submit an agreed order narrowing the scope of the preliminary injunction.

The City's goals in enacting Albuquerque's Energy Conservation Code and the Albuquerque High Performance Buildings Ordinance are laudable. Unfortunately, the drafters of the Code were unaware of the long-standing federal statutes governing the energy efficiency of certain HVAC and water heating products and expressly preempting state regulation of these products when the Code was drafted and, as a result, the Code, as enacted, infringes on an area preempted by federal law. The extent to which the Code and the Ordinance are preempted will be determined after development of a full record.

<u>CONCLUSION</u>

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Preliminary Injunction, filed August 29, 2008, **[Doc. No. 30]**, is **GRANTED**. Defendant City of Albuquerque is hereby enjoined from enforcing Volumes I and II of the Albuquerque Energy Conservation Code and the High Performance Building Ordinance pending resolution of this case. If there are portions of the Albuquerque Energy Conservation Code that are not implicated by the claims in this case,

the parties are encouraged to submit an agreed order narrowing the scope of this preliminary injunction.

DATED this 3rd day of October, 2008.

_____
MARTHA VÁZQUEZ
Chief District Court Judge

24